UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICK BROWN | ) | |
| | ) | Civil Action No. 24-00423 |
| *Plaintiff*, | ) | |
| v. | ) | Section R |
| | ) | Judge Sarah S. Vance |
| JASON R. WILLIAMS, in his official capacity as | ) | |
| Orleans Parish District Attorney, et al. | ) | Division 4 |
| | ) | Magistrate Judge Karen Wells Roby |
| *Defendants*. | ) | |
| | ) | **JURY TRIAL REQUESTED** |

## FIRST AMENDED COMPLAINT

1. Plaintiff Patrick Brown brings this complaint for damages, alleging as follows, against the Defendants:

### PARTIES

2. Plaintiff **Patrick W. Brown** is a citizen of Mississippi because he lives, and intends to stay, in Mississippi.

3. Defendant **Jason R. Williams** is the Orleans Parish District Attorney, sued in his official capacity as the successor in office to former District Attorney Harry F. Connick, Sr. Williams is a citizen of Louisiana because he lives, and intends to stay, in Louisiana.

4. Defendant **David Wolff** is a former Orleans Parish Assistant District Attorney. He is sued in his individual capacity.

5. Defendant **City of New Orleans** is a political subdivision of the State of Louisiana. It operates the New Orleans Police Department, a law enforcement agency operating in the Eastern District of Louisiana which employed and controlled the Officer-Defendants in this case and was responsible for the hiring, training, and discipline of the officers. The City of New Orleans, through the NOPD, also created, instituted, and oversaw enforcing the policies and procedures at issue in

1

this case.

6.      Defendant **Cathey Carter** is a former NOPD detective. She is sued in her

individual capacity.

7.      Defendant **Doe Handwriting NOPD Officer** is the officer whose handwriting is

found on the following document, if the handwriting is not Det. Cathey Carter's.



## JURISDICTION

8.      This Court has subject matter jurisdiction over Brown's claims under 28 U.S.C.

§§ 1331 and 1334 because Brown brings this action under 42 U.S.C. § 1983 for violations of his

federal constitutional rights.

9.      This Court has supplemental jurisdiction over any state-law claims under 28 U.S.C.

§ 1367.

10.      This Court has personal jurisdiction over the Orleans Parish District Attorney and

other defendants because they live and/or work within Louisiana and because Defendants' conduct

and activities giving rise to Brown's claims occurred within Louisiana, as explained below.

**VENUE**

11.     Under 28 U.S.C. § 1391, this Court is the proper venue for Brown's claims because the crime for which Brown was wrongfully convicted and imprisoned occurred, was investigated, and was prosecuted in Orleans Parish, which is within this district.

**FACTS**

12.     According to the U.S. Department of Justice, the state of Louisiana routinely has the highest rate of per-capita incarceration in the world.

13.     And Orleans Parish has the highest rate of per-capita incarceration of all Louisiana parishes.

14.     Simultaneously—and paradoxically—Louisiana is consistently ranked one of the most dangerous states in America, with the highest per-capita crime rate. Similarly, New Orleans has one of the highest crime rates in America compared to communities of all sizes.

15.     These contradictory statistics suggest that something about Louisiana's and Orleans Parish's historical approach to incarcerating people convicted of crimes is not working.

16.     Part of the problem may be that Louisiana, generally, and New Orleans, specifically, have often put the wrong people in prison, and let the true criminals go free.

17.     According to the National Registry of Exonerations, Louisiana has the highest rate of per-capita exonerations for wrongfully convicted persons in the nation.

18.     To this day, Orleans Parish has the highest rate of per-capita exonerations for any parish or county in America.

19.     The outsized rate of wrongful convictions in Orleans Parish is largely attributable to the historical policies and practices of the District Attorney's office, led by Harry Connick Sr. from 1973 to 2003.

20.     Throughout Connick's tenure, and especially during the 1990s, the District Attorney prioritized overzealous prosecutions and securing convictions, rather than seeking truth and justice.

21.     For example, the District Attorney had no meaningful onboarding process for new assistant district attorneys (ADAs) and failed to train attorneys on their constitutional and ethical obligations. The District Attorney simply expected them to learn on the job.

22.     ADAs struggled to understand—and the District Attorney downplayed—their disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

23.     *Brady* requires prosecutors to disclose any evidence favorable to an accused and material to that person's potential guilt or punishment.

24.     "Favorable" evidence is defined broadly; it means that the evidence has "some" exculpatory value or could be used to impeach witnesses.

25.     "Material" is also defined broadly to mean that the undisclosed evidence, in any reasonable likelihood, could have affected the judgment of the jury.

26.     A prosecutor's failure to disclose *Brady* material is a constitutional violation, regardless of the prosecutor's subjective intent. In other words, even if the prosecutor inadvertently failed to disclose *Brady* material or simply misunderstood the significance of the evidence in the context of the case, a constitutional violation has occurred, and the defendant has been deprived of due process and a fair trial.

27.     In Orleans Parish, the ADAs handled many felony cases and would often be assigned case files shortly before trial, which limited the time ADAs had to learn case facts, nuances, and weaknesses.

28.     Without enough time to study their cases, ADAs often struggled to discern what

evidence they needed to disclose under *Brady*, as well as what evidence might have already been disclosed before the current prosecutor assumed the file.

29. What's worse, the District Attorney maintained a written *Brady* policy within a larger policy manual, from at least 1987 through 2003, that was objectively wrong:

> In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so called <u>Brady</u> material—that is, information in the possession of the State which is exculpatory regarding the defendant. The duty to produce <u>Brady</u> material is ongoing and continues throughout the entirety of the trial. Failure to produce <u>Brady</u> material has resulted in mistrials and reversals as well as extended court battles over jeopardy issues. In all cases, a review of <u>Brady</u> issues, including apparently self-serving statements made by the defendant, must be included in a pre-trial conference and each Assistant must be familiar with the law regarding exculpatory information possessed by the State.

30. For example, the District Attorney's written *Brady* policy suggests that prosecutors have a disclosure obligation only in "most cases," even though *Brady* material is constitutionally required to be disclosed in *all* cases.

31. The District Attorney's written *Brady* policy also suggests that prosecutors' disclosure obligations are triggered only by judicial order on a defense motion, even though *Brady* material must be disclosed regardless of whether the defendant requested it.

32. The District Attorney's written *Brady* policy also defines *Brady* material to include only "information . . . which is exculpatory," even though *Brady* material includes "favorable" evidence that undermines the prosecutors' theories or that can be used to impeach witnesses.

33. The District Attorney maintained this written *Brady* policy and, in fact, re-printed and re-issued it in February 1987, March 1997, and August 1999, though the District Attorney knew of its inaccuracies.

34. Elsewhere, the District Attorney's policy manual said that ADAs "are required to

read and follow the policies in this manual."

35. Combining this mandate with the written *Brady* policy, ADAs were required to read and follow an objectively wrong interpretation of their *Brady* disclosure obligations from at least 1987 through 2003.

36. Because the District Attorney simply expected ADAs to "read and follow the policies in th[e] manual," and to generally "be familiar with the law," the District Attorney provided little to no formal *Brady* training, supervision, or regular feedback on adherence to or compliance with *Brady*.

37. For example, the District Attorney did not require section or division leaders or more senior ADAs to supervise or confirm that junior ADAs had correctly identified *Brady* material and disclosed this information to defense counsel before trial.

38. The District Attorney designated no other prosecutor to serve as the final decision maker, or head of any reporting chain, for ADAs with questions about whether information was or was not *Brady* material and therefore required to be disclosed. The District Attorney simply expected junior ADAs to figure it out and provided no formal oversight of their decisions.

39. The District Attorney did not require prosecutors to confirm that they had collected all information from police officers, investigators, or detectives working on a case, which would often include information favorable to the defendant and thus constitute *Brady* material that must be disclosed.

40. The District Attorney did not require ADAs to report concerns about whether other prosecutors had complied with, or in fact violated, their pre-trial disclosure obligations.

41. Even when the District Attorney learned about *Brady* violations within the office (such as through judicial orders or opinions), the District Attorney failed to record or otherwise

6

track the type or frequency of those violations, which would have allowed the District Attorney to discern and correct patterns of *Brady* violations or systemic misunderstandings of prosecutors' disclosure obligations.

42.     The District Attorney could have created written *Brady* policies, training materials, FAQs, and the like from its own history of case reversals to ensure that similar mistakes would not happen again, but simply failed, or chose not, to do so.

43.     Instead, the District Attorney publicly shared that "[w]hat some judges, or courts consider to be Brady is sometimes ridiculous to the extreme," revealing that the District Attorney refused to believe that the ADAs' known *Brady* violations were problematic in any way.

44.     The District Attorney also failed to discipline prosecutors found to have violated *Brady*. They were not reprimanded; there were no notes or marks included in their personnel files; they were not instructed to undertake additional research or independent study of *Brady*'s requirements or obligations; and they were allowed to continue to try to discern what case file information was or was not *Brady* material for themselves with no oversight.

45.     In contrast, however, the District Attorney regularly tracked "wins" (convictions) and "losses" (acquittals), with acquittals often leading to reprimand or discipline. Unlike *Brady* violations, acquittals were recorded in ADA personnel files and openly discussed (or ridiculed) within the office.

46.     In other words, the District Attorney cared more about "winning" by securing convictions, even at the price of imprisoning innocent people, than ensuring justice was done by adhering to the requirements of due process and fair trials.

47.     By tracking only acquittals and faulting prosecutors for failing to convict defendants, while also ignoring or downplaying prosecutors' *Brady* violations, the District

Attorney further confused prosecutors about the contours of their disclosure obligations and discouraged *Brady* disclosures.

48.     The District Attorney's objectively wrong written *Brady* policy; the lack of meaningful training, supervision, and feedback; and the prioritization of convictions over the Constitution led to many *Brady* violations over the years.

49.     For instance, between just October 1992 and August 1997, Orleans Parish ADAs violated *Brady* at least 18 times in felony trial cases, including cases like *Kyles v. Whitley* (1995) in which the U.S. Supreme Court announced to the nation that the Orleans Parish District Attorney misunderstood *Brady*.

50.     In the five years after *Kyles*, when the District Attorney should have required more exacting compliance with *Brady*, re-trained prosecutors on their disclosure obligations, and re-wrote its policy manual to adhere to the law, Orleans Parish ADAs committed more *Brady* violations in at least 12 major cases.

51.     Indeed, Orleans Parish prosecutors committed at least 24 *Brady* violations in felony cases before prosecuting Patrick Brown and another 18 before Brown's conviction became final. Examples include:

    i.     **Larry Hudson (convicted in 1967)**: prosecutors failed to disclose a supplemental police report detailing that the prosecution's only testifying witness had originally identified someone else in a photo array and struggled to consistently identify an alleged perpetrator in a physical lineup.

    ii.    **Hayes Williams (convicted in 1968)**: prosecutors failed to disclose a supplemental police report containing prior inconsistent statements by the prosecution's only eyewitness, who had said he never saw the face of the third perpetrator, who the prosecution argued was Williams.

    iii.   **Michael Williams (convicted in 1974)**: prosecutors failed to disclose a police report explaining that the prosecution's key witness was likely high or otherwise impaired when she allegedly saw the defendant commit the crime because she had just visited a methadone clinic.

    iv.       **Gregory Bright** and **Earl Truvia** (**convicted in 1976**): prosecutors failed to disclose evidence of the real perpetrator, as well as evidence that the prosecution's only witness was a heroin-addicted paranoid schizophrenic who was paid to talk to the police and whose eyewitness account fundamentally conflicted with scientific evidence of the crime.

    v.       **Errol Bernard** (**convicted in 1976**): prosecutors failed to disclose a police report containing a testifying witness's prior inconsistent statement that supported the defendant's version of events, corroborated other favorable witness statements, and directly undermined the prosecution's theory.

    vi.       **Floyd Falkins** (**convicted in 1976**): prosecutors failed to disclose two witness's prior identifications of a different alleged perpetrator.

    vii.       **Elvis Brooks** (**convicted in 1977**): prosecutors failed to disclose a note in the prosecutor's files confirming that Brooks was not the source of crime-scene fingerprints, that two witnesses gave prior inconsistent statements to police, and that victims of a similar crime did not identify the defendant as the likely perpetrator.

    viii.       **Calvin Williams** (**convicted in 1977**): prosecutors failed to disclose a police report detailing that the prosecution's eyewitness did not identify the defendant in a previous photo lineup and had made prior inconsistent statements to police.

    ix.       **Issac Knapper** (**convicted in 1979**): prosecutors failed to disclose a police report that contradicted the prosecution's evidence and police witness testimony, including by confirming that the gun used to murder the victim was linked to another crime with a different, identified shooter.

    x.       **William Perkins** (**convicted in 1980**): prosecutors failed to disclose a written witness statement that supported the defendant's theory of self-defense and undermined the prosecution's version of events.

    xi.       **Ronald Monroe** (**convicted in 1980**): prosecutors failed to disclose a confession by an alternate suspect.

    xii.       **John Floyd** (**convicted in 1982**): prosecutors failed to disclose fingerprint analyses that did not match the defendant's fingerprints; the fact that the interrogating detective showed the defendant crime-scene photos, which increased the likelihood of a false or coerced confession; and witness statements that undermined the police investigation of the defendant.

    xiii.       **Reginald Adams** (**convicted in 1983**): prosecutors failed to disclose evidence of forensic examinations, including ballistics testing, as well as a police report linking two people, with no connection to the defendant, with the murder weapon and valuables stolen from the crime scene.

    xiv.       **Stephen Rosiere** (**convicted in 1984**): prosecutors failed to disclose testifying and nontestifying witness statements corroborating the defendant's theory of

self-defense and undermining the prosecution's theory of the crime.

xv.        **Curtis Kyles (convicted in 1984)**: prosecutors failed to disclose testifying and nontestifying witness statements that were materially inconsistent and at times self-incriminating, as well as a list of vehicles present at the crime scene that favored the defendant.

xvi.       **John Thompson (convicted in 1985)**: prosecutors failed to disclose blood samples collected from the crime scene, as well as a lab report identifying the perpetrator had a different blood type than the defendant.

xvii.      **Calvin Duncan (convicted in 1985)**: prosecutors failed to disclose evidence that the perpetrator's physical characteristics were different from the defendants, as well as the circumstances of the witness's identification which undermined all reliability in that identification.

xviii.     **George Toca, Jr. (convicted in 1985)**: prosecutors failed to disclose eyewitnesses' prior inconsistent statements, as well as a police report corroborating the defendant's alibi and containing information about another suspect.

xix.       **Raymond Flanks (convicted in 1985):** prosecutors failed to disclose prior inconsistent statements from the prosecutor's only eyewitness that confirmed her description of the perpetrator did not match the defendant's physical description, as well as the fact that the police detective suggested who the witness should identify in a photo lineup.

xx.        **Sullivan "Sal" Walter (convicted in 1986):** prosecutors failed to disclose blood and saliva analyses reports that would have excluded the defendant as the perpetrator, as well as prior inconsistent statements by the victim and specific details about the crime that undermined the reliability of any potential identification.

xxi.       **Erin Hunter (convicted in 1988):** prosecutors failed to disclose the key witness's prior inconsistent statement about whether the witness in fact saw the defendant after the crime.

xxii.      **Darryl Washington (convicted in 1988):** prosecutors failed to disclose witness's prior inconsistent statement during which witness identified the perpetrator by a different name.

xxiii.     **Eugene Lindsey (convicted in 1988)**: prosecutors failed to disclose key witness's prior statements corroborating the defendant's theory of the case.

xxiv.      **Alvin Jeanmarie (convicted in 1992)**: prosecutors failed to disclose initial and supplemental police reports containing witnesses' prior consistent statements about the perpetrator's appearance.

xxv.       **Jerome Morgan (convicted 1994):** prosecutors failed to disclose 911 call log establishing crime scene chronology/timeline undermining prosecution's only theory,

as well as circumstances of police photo lineup in which detective told teenage witnesses which photo belonged to the defendant.

    xxvi.      **Alfred Oliver (convicted in 1994**): prosecutors failed to disclose initial and supplemental police reports containing victims' prior inconsistent statements, including statements about circumstances of one victim's escape from the perpetrator.

    xxvii.     **Larry Moses (convicted in 1995**): prosecutors failed to disclose that key witness suffered from mental health and psychotic disorders, as well as key witness's prior inconsistent statements and motive to falsely accuse the defendant, including fact that witness had accused romantic rivals of crimes in the past.

    xxviii.    **Daniel Rideau (convicted in 1995**): prosecutors failed to disclose supplemental police report containing non-testifying witness statements describing a person other than the defendant as leaving the crime scene with the type of gun used in the crime.

    xxix.     **Kuantau Reeder (convicted in 1995):** prosecutors failed to disclose key witness's prior criminal history, which the witness lied about during trial; the failure to analyze fingerprint evidence found at the crime scene or compare the crime-scene fingerprints to the defendant's fingerprints, which would have excluded the defendant; and prosecutors' notes that witness twice identified a different suspect during photo lineups.

    xxx.      **Darnell Lewis (convicted in 1995):** prosecutors failed to disclose supplemental police report and notes containing prior inconsistent statements by victims that they could not see or identify the perpetrator.

    xxxi.     **Dwayne Williams (convicted in 1995**): prosecutors failed to disclose police report containing witnesses' prior inconsistent statement and police informant's description of perpetrator, as well as latent fingerprints that were not a match for the defendant.

    xxxii.    **Dan L**. **Bright (convicted in 1996**): prosecutors failed to disclose an informant's report that the defendant had been prosecuted and imprisoned for a murder committed by someone else, as well as a key witness's criminal history.

    xxxiii.   **Shareef Cousin (convicted in 1996):** prosecutors failed to disclose key witness's prior inconsistent statement that she could not see or identify perpetrator because it was dark, and she was not wearing contacts or glasses at the time.

    xxxiv.   **Kunta Gable, Sidney Hill (aka Leroy Nelson),** and **Bernell Juluke (convicted in 1996):** prosecutors failed to disclose police communication logs and other information including prior inconsistent statements about the color of the getaway car at the crime scene.

    xxxv.    **Craig Johnson (convicted in 1996):** prosecutors failed to disclose that the alleged victim had accused at least 16 people of robbing him and then demanded money in exchange for dropping the charges.

xxxvi.      **Robert Jones (convicted in 1996):** prosecutors failed to disclose victim's prior statements containing key details about the location of the crime and the perpetrator's physical appearance that exculpated the defendant, that a police informant possessed items stolen from each crime scene, and a prosecutor's internal memo corroborating information that favored the defendant.

xxxvii.      **Juan Smith (convicted in 1996):** prosecutors failed to disclose investigation notes containing victim's prior inconsistent statements, such as inability to describe the perpetrator other than as a "black male" which directly undermined victim's trial testimony about the perpetrator's alleged build, haircut, and gold teeth.

xxxviii.      **James Walker (convicted in 1997):** prosecutors failed to disclose witness's prior inconsistent statement that the perpetrator was 10 years younger than the defendant, three inches shorter than the defendant, and had a mustache that the defendant did not.

xxxix.      **Dwight LaBran (convicted in 1997):** prosecutors failed to disclose that single prosecution witness and only eyewitness gave a false name to police and at trial to avoid being arrested on several parole violations and lied about details he allegedly witnessed during crime.

xl.      **Eddie Triplett (convicted in 1998):** prosecutors failed to disclose police report detailing how officers stopped the defendant and another man before arresting the defendant and releasing the other man though the report identified the other man as the person detained and arrested, which undermined police testimony that no other suspects were present at the crime scene.

xli.      **David Mahler (convicted in 1998):** prosecutors failed to disclose a supplemental police report and prior inconsistent statements of several witnesses that corroborated the defendant's version of events and contradicted the prosecution's theory of the case.

xlii.      **Cedric Dent (convicted in 1999):** prosecutors failed to disclose notes undermining a detective's testimony about how the defendant became a suspect and revealing a second eyewitness who described the perpetrator's physical appearance differently from the defendant's known appearance, as well as four out of six different, prior witness statements from the prosecution's primary witness.

52.      Because *Brady* violations, by their nature, involve suppressing, withholding, or generally failing to disclose evidence, they are inherently difficult to uncover and prove.

53.      In addition, in many cases in which a person has a strong *Brady* claim, courts will resolve the case on other grounds and thus not ultimately determine whether prosecutors have in fact violated *Brady*.

54.     In other cases, prosecutors will offer plea agreements or other incentives for people to drop previously asserted *Brady* claims and thus avoid their ultimate determination.

55.     As a result, the number of known *Brady* violations in Orleans Parish—which is already staggering—most likely *underestimates* the number of *Brady* violations by the District Attorney during this time.

### *NOPD's Pattern of Misconduct*

56.     Just like OPDA, NOPD and the City of New Orleans by and through their policymakers, maintained a policy, custom, or pattern and practice of condoning misconduct, including by failing to train, supervise, and discipline police officers for *Brady* violations and fabrication of evidence.

57.     Among other things, the NOPD failed to maintain individual training records; failed to conduct any in-service or advanced training for supervisors; failed to ensure that its supervisors had the training and resources to supervise serious investigations; and failed to adequately document and enforce disciplinary investigations and findings against individual officers.

58.     The NOPD of the 1990s was a "troubled and unruly police department" with "the highest rate of proven wrongful convictions and convictions caused by official misconduct in the country."

59.     An FBA investigation, "Operation Shattered Shield" found misconduct that "no doubt epitomized a completely broken police department."

60.     According to LSU criminologist Peter Scharf, the NOPD of the 1990s was marked by systemic corruption." In other words, "This was an era—not an individual."

61.     In 1994, the United States Attorney for the Eastern District of Louisiana said he "would describe corruption in the New Orleans Police Department to be pervasive, rampant and systemic."

62.     Indeed, during this period, ten percent of NOPD's officers were facing criminal charges.

63.     More than forty NOPD officers were arrested from 1991 to 1994 for crimes like murder, rape, bank robbery, and auto theft. In 1993, two NOPD officers were charged with the rape of a woman in their custody, and seventeen officers were either arrested or convicted for criminal activity. And in 1995, thirty NOPD officers were charged with felonies including rape, kidnapping, and extortion.

64.     In 1991, shortly before Patrick Brown was wrongly prosecuted and convicted, , the International Association of Chiefs of Police (IACP) published a report citing a "stunning lack of training" at the NOPD and finding that the NOPD's training record was "not nearly in compliance with professional expectations." With respect to criminal investigations, the report concluded, that NOPD's investigations bureau was "failing in almost every crime category" due to "primitive case management practices, absence of performance goals, measurement accountability, flawed selection process, and a stunning lack of training [that] inhibits investigative effectiveness."

65.     The IACP also noted problems with the NOPD's lack of supervision and its derelict disciplinary process.

66.     With regard to supervision, it found that:

    i.     "Commanders and supervisors do not establish goals or objectives for their subordinates. Their superiors do not establish goals or objectives for them."

14

ii.   "A number of officers apparently last received management/command/supervisory experience four years ago."

iii.   "A serious flaw in command/supervision relationships is the absence of performance goals to guide, evaluate, and correct performance of subordinates and to form the basis for commonly understood superior/subordinate performance expectations."

67.   On March 10, 1993, then-recent events compelled a New Orleans city councilperson to request that the United States Attorney conduct a criminal investigation of the NOPD. The councilperson wrote, "I am afraid that the problems afflicting the department are so deeply seeded and widespread that only by combining the resources of your office with those of the department itself, can this task be accomplished."

68.   In 1995, the New Orleans Human Relations Committee conducted a study that included the views of the City's Chief Administrative Officer, the City Attorney, and the Mayor's Criminal Justice Coordinator, among others. The findings concluded that supervision of NOPD officers was a major problem: "District Commanders, the Department's front line of management, had no authority over, or even information about, details working in their district. This meant, for example, that a district commander could not meaningfully monitor, much less manage, actions of officers wearing NOPD uniforms and working in their district."

69.   The study further found that "[t]here were no supervisory training programs for sergeant[s] and above." Instead, training across the board was "generally non-existent or haphazard," with "virtually no on-the-job supervision of policemen on the beat."

70.   Throughout the 1970s, 1980s, and 1990s, the NOPD maintained a widespread practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional

investigative techniques, including (a) creation and presentation of false or materially misleading evidence; (b) failure to document and disclose exculpatory and impeachment evidence to prosecutors, defense counsel, and courts; and (c) as engaging in the affirmative and/or passive concealment of those types of misconduct.

71.    Despite knowing that NOPD's custom, pattern, and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, and failing to adequately supervise, discipline, and train its officers was reasonably likely to lead to wrongful convictions, the NOPD leadership continued to maintain those customs, patterns, and practices of deliberate indifference to the rights of suspects and criminal defendants.

72.    With respect to training in particular, in 1994, the Louisiana National Guard, in partnership with the City, found that "It is clearly apparent that the city and department leaders do not understand, or simply choose to ignore, the importance of training for police officers and police civilians engaged in supporting police officers. . . . Unfortunately, even after three previous reports criticizing training within the NOPD, very little action has been taken to improve the situation."

73.    In addition, before and at the time of Brown's conviction, the NOPD, by and through its final policymakers, maintained a custom or practice of a "blue curtain," or code of silence, pursuant to which police misconduct—including the manufacture of false evidence, the suppression of exculpatory evidence, and the malicious investigation of innocent individuals without probable cause—was routinely not reported by fellow officers or not disciplined or otherwise addressed by the department. To the contrary, officers customarily engaged in misconduct themselves to cover up any misconduct they witnessed by a fellow officer.

74.    By way of example, in 1979, then-Superintendent James C. Parsons testified at a jury trial that a code of silence existed at the NOPD. *Thomas v. City of New Orleans*, 687 F.2d 80,

82 (5th Cir. 1982). In that case, Officer Thomas was retaliated against and discharged because of his complaint against a fellow officer. Superintendent Parsons testified that he had considered taking steps to protect officers who broke the code of silence, but he did not do so.

75.     As another example, in 1981, NOPD paramedic Christopher Hero was wrongfully dismissed in retaliation for reporting to the Internal Affairs Division another officer's unlawful conduct. The City of New Orleans Civil Service Commission reinstated Hero and found that he had "established beyond doubt that a 'code of silence' does operate within the New Orleans Police Department …". *See Christopher Hero v. Dep't of Police*, No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983).

76.     Notwithstanding these and other warnings, the NOPD failed to institute meaningful reforms that would have constrained police misconduct and addressed the code of silence at the NOPD.

77.     These failures of training, supervision, and discipline led to a pattern and practice of unconstitutionally suggestive identification processes, fabrication of evidence, and *Brady* violations by NOPD officers.

### *In 1994, someone molests six-year-old L.B. and gives her gonorrhea.*

78.     In 1994, **L.B.** was a six-year-old girl living in Orleans Parish with

  i.     her twenty-two-year-old mother, **Cathy**;

 ii.     her mother's boyfriend, **Patrick Brown**;

iii.     her younger siblings, Kendall and Kayla;

 iv.     her newborn baby sister (Cathy and Patrick Brown's child), Kimberly;

  v.     her twenty-one-year-old cousin, **Lamar Wharton**; and

vi.     her maternal grandfather, Lawrence Brown.[1]

79.     During the week, L.B. typically stayed at her maternal grandmother's house (about a block away) so that her grandmother could make sure L.B. got to school every day on time.[2]

80.     On February 16, 1994 (Ash Wednesday), L.B. complained to her grandmother that she was in pain and, upon a closer look, her grandmother thought L.B.'s "bottom was raw."

81.     The next day at school, L.B. cried and complained to school personnel that she was in pain that felt like a stomachache. L.B.'s grandmother told L.B.'s mother Cathy that she needed to see a doctor.

82.     On Friday, Cathy noticed that L.B. appeared to have unusual and discolored vaginal discharge. Cathy took L.B. to Charity Hospital, where she received anti-fungal cream and was told to return on Monday.

83.     On Monday, February 21, L.B.'s maternal great-aunt **Carolyn Wharton**—Lamar Wharton's mother—and L.B.'s grandmother brought L.B. back to Charity Hospital, where Dr. Ronald Wilcox, a pediatric resident, examined her.[3]

84.     Recognizing L.B.'s vaginal discharge as likely caused by a sexually transmitted infection, meaning that six-year-old L.B. had been sexually abused, Dr. Wilcox asked Dr. Maria Mena, a pediatrician with the hospital's Child Sexual Abuse Clinic, to assist with the examination.

85.     One or both doctors also told Carolyn Wharton and L.B.'s grandmother that they suspected someone had sexually assaulted L.B.

---

[1]     That Patrick and Lawrence both have the last name "Brown" is a coincidence; they are not biologically related.

[2]     L.B.'s maternal grandmother and grandfather were divorced.

[3]     Carolyn Wharton refused to allow her son Lamar to live with her because she knew him to be a troubled, drug-addicted young man. Carolyn Wharton nonetheless continued to associate with her son and helped her sister Cathy care for Cathy's household.

86.     During their examination, the doctors, Carolyn Wharton, and L.B.'s grandmother tried to assure L.B. that she could speak freely with them and to encourage her to tell the doctors about whether anyone had touched her.

87.     The group's efforts to elicit information from L.B. included questions about who L.B. lived with and her "daddy."

88.     According to L.B.'s medical records, when doctors continued to ask L.B. if anyone had touched her, she started crying, and doctors ultimately wrote down that "daddy Patrick" assaulted L.B.[4]

89.     Medical records also note that L.B.'s pelvic exam supposedly revealed evidence of vaginal penetration "a couple of weeks" earlier based on the appearance of her hymen, and L.B.'s cervical swabs ultimately tested positive for gonorrhea.[5]

90.     According to the National Institutes of Health, gonorrhea is a curable sexually transmitted infection caused by the bacteria *Neisseria gonorhoeae*, and people typically develop anti-gonococcal antibodies in response to infection. Even with the development of antibodies, however, repeat infections from *Neisseria gonorhoeae* are still common.

91.     L.B.'s doctors called the police, and after L.B.'s medical exam, two NOPD officers, including Detective Cathey Carter, arrived at the hospital.

92.     L.B.'s doctors told Detective Carter that L.B. identified "daddy Patrick," though

---

[4] L.B. is confident that she would not have voluntarily said "daddy Patrick" raped or assaulted her. At most, six-year-old L.B. may have misunderstood or confusingly responded to the group's questions about her "daddy."

[5] Though there is no dispute that L.B. was raped and contracted gonorrhea, that medical examiners could discern the approximate date of her rape based on the appearance of her hymen is highly unlikely. It is now widely understood in the scientific and medical community that examining a person's hymen is not an accurate or reliable indicator of virginity or previous sexual activity, including sexual assault.

L.B. is sure she did not.

93.     Detective Carter and a second officer then interviewed L.B. at the hospital by asking her about "daddy Patrick" without any family members present.

94.     L.B.'s mother Cathy and Patrick Brown then arrived at the hospital, where the police officers advised Brown of his *Miranda* rights and had he and Cathy accompany them to police headquarters for further questioning.

95.     Brown waived his *Miranda* rights and denied raping, or engaging in any other inappropriate behavior with, L.B.

96.     Brown also admitted to Detective Carter that he had gonorrhea a year earlier, in 1993, from a consensual sexual encounter with L.B.'s mother Cathy and a third person. He and Cathy were both treated for gonorrhea at that time.

97.     Cathy confirmed that she and Patrick had been infected with, and treated for, gonorrhea a year earlier.[6] Cathy also told Detective Carter that she and Brown were still regularly intimate with each other.

98.     Cathy insisted that Brown did not—and would never—rape or molest her daughter.

99.     Police arrested Brown that day for aggravated rape, then defined as "anal or vaginal sexual intercourse . . . deemed to be without lawful consent of the victim because . . . the victim is under the age of twelve years."[7]

---

[6]     Medical records confirm that Cathy tested positive, and was treated with antibiotics for, gonorrhea in March 1993. By August 1993, when Cathy was pregnant with her and Patrick's daughter Kimberly, she no longer had a gonorrhea infection, and gonorrhea did not pose any pregnancy risk for her daughter.

[7]     La. Stat. § 14:42(A)(4) (1994). A conviction for the crime of aggravated rape carried a punishment of "life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." § 14:42(C) (1994).

*The District Attorney develops a case against Patrick Brown by withholding evidence.*

100.    After Brown's arrest, he, Cathy, L.B.'s grandfather, and Lamar Wharton were all tested for gonorrhea.

101.    There are different types of tests for gonorrhea.

102.    A test for active gonorrhea (commonly conducted through urine samples) will reveal whether the patient is or is not currently infected. A positive result on this test reflects a current infection, while a negative result reflects that the patient is not currently infected. A negative result on this test does *not* reflect whether the patient has ever had gonorrhea in the past or whether the patient has developed antibodies in response to a previous infection.

103.    On February 24, 1994—within days of L.B. testing positive for active gonorrhea—Cathy was tested for active gonorrhea.

104.    Though Cathy had gonorrhea in the past, her test results were negative for active infection.

105.    Cathy's negative test result is inconsistent with her being regularly intimate with Brown if it is true that Brown had recently raped L.B. and infected her with gonorrhea.

106.    According to the District Attorney's files, ADAs prosecuting Brown for aggravated rape knew that Cathy tested negative for active gonorrhea at the same time her daughter had allegedly contracted gonorrhea from Cathy's boyfriend.

107.    Prosecutors did not disclose Cathy's negative test results to Brown's defense counsel.

108.    Also according to the District Attorney's files, NOPD Detective Carter sent L.B.'s grandfather and Wharton to the "Delgado City Clinic" for STD testing.

109.    At Delgado, L.B.'s grandfather and Wharton were tested only for active gonorrhea.

110.    Though L.B.'s grandfather had gonorrhea in the past, his test results were negative

for active infection.

111.    Wharton's test results were also negative for active gonorrhea, but he tested positive for urethritis, a yeast infection most commonly caused by gonorrhea.

112.    A month later, in March 1994, while housed at Orleans Parish Prison, Patrick Brown was tested for gonorrhea *antibodies*.

113.    A test for gonorrhea antibodies will reveal whether the patient had gonorrhea sometime in the past. A positive result on this test does not signify a current, active infection or even a recent infection. But a negative result on this test would indicate that the patient has likely never had gonorrhea.

114.    Brown tested positive for gonorrhea antibodies, which according to Brown's test results, "suggests exposure at an undetermined time."

115.    Brown had told Detective Carter that he had contracted and been treated for gonorrhea in 1993.

116.    The prosecutors knew that Brown's test results did not confirm any active gonorrhea infection.

117.    Around the same time, on March 23, 1994, Wharton got into a verbal and physical dispute with L.B.'s mother Cathy.

118.    During their fight, Cathy accused Wharton of being a "rock head" (drug addict), and Wharton responded, "Yeah and I f**ked your daughter too."

119.    Cathy told prosecutors that Wharton said he "f**ked" L.B.

120.    According to the District Attorney's files, prosecutors spoke directly to Wharton on April 2, 1994, and Wharton told the prosecutors a slightly different story: Wharton reported that L.B.'s mother Cathy said to him, "I told [the] DA you f**ked my daughter," to which Wharton

22

admittedly responded, "If I had [sic] did, I wouldn't be the one to do the time."

121.    According to the District Attorney's files, prosecutors also spoke to other witnesses who overheard Cathy and Wharton's dispute. These witnesses corroborated Cathy's version of events.

122.    Cathy's neighbor Miko Deloney told prosecutors that he heard Wharton tell Cathy: "That's why your man is taking another n****rs charge" and "I f**ked your daughter."

123.    Carolyn Wharton told prosecutors that Wharton said, "that's why your man is in jail, I f**ked your daughter."

124.    It was obviously a problem for the prosecutors that multiple people heard Wharton sexualize a six-year-old girl by saying he "f**ked" L.B.

125.    Indeed, in an internal pre-trial memo, a prosecutor included a note about Wharton's statements under the heading "PROBLEMS AND ANTICIPATED DEFENSES":

```
PROBLEMS AND ANTICIPATED DEFENSES:  LAMAR WHARTON HAD BEEN
LIVING WITH CATHY BROCK FOR A WHILE.  ON MARCH 23, 1994 THEY GOT
INTO A SHOUTING MATCH THAT TURNED INTO A FIST FIGHT IN THE
MIDDLE  OF AN IBERVILLE PROJECT COURTYARD.  CATHY BROCK CALLED
LAMAR A "ROCK HEAD" AND YELLED THAT HIS MOTHER "SUCKS DICK".
LAMAR RESPONDED, "YEA, I'M A ROCK HEAD AND I FUCKED YOUR
DAUGHTER TOO".
```

126.    But prosecutors never revealed the witness statements corroborating Cathy's account of her fight with Wharton to Brown's defense counsel.

127.    The District Attorney, through ADAs David Wolff and Elizabeth Teel, continued to pursue a case against and prosecute Patrick Brown for the aggravated rape of L.B.

128.    The District Attorney never criminally charged Wharton and instead relied on him to spin the facts in the prosecution's favor and testify against Brown.

129.    Brown's trial in Orleans Parish Criminal District Court, before Judge Morris Reed, began with jury selection on December 13, 1994—long after prosecutors knew Wharton admitted that he raped L.B.

130.    The trial officially began during the afternoon of December 14. ADA Wolff gave the opening statement for the District Attorney.

131.    The prosecutors called NOPD Cathey Carter to testify.

132.    Det. Carter testified that she interviewed L.B. at Charity Hospital with a "second detective."

133.    The second detective was never identified in the police reports or at trial.

134.    Det. Carter testified that she "never had any [other] suspects" besides Patrick Brown.

135.    The prosecutors did not question Det. Carter about asking Lawrence Brown and Lamar Wharton to get tested for gonorrhea.

136.    Defense counsel did not question Det. Carter about Lamar Wharton.

137.    The prosecutors called Lawrence Brown to testify.

138.    ADA Wolff asked Lawrence Brown whether police told him to go to the clinic to get tested for gonorrhea.

139.    Lawrence Brown testified that he went to the clinic voluntarily.

140.    The prosecutors called Lamar Wharton to testify.

141.    While testifying, Wharton denied raping or sexually assaulting L.B.

142.    When asked about L.B.'s mother Cathy accusing Wharton of being the one to rape L.B., Wharton testified that he told Cathey "If I am the one who raped [L.B.] I'm not going to jail for it."

143.    Wharton also testified that, "Patrick's the one with gonorrhea and I'm not."

144.    About getting tested for gonorrhea, Wharton seemed confused about how he should be answering ADA Wolff's questions. Wharton testified:

```
Q     Lamar, shortly after this arrest, did you go to
Delgado?
A     Yes, I did.
Q     For what reason?
A     To get myself checked?
Q     Why did you go to Delgado?
A     Because Cathy told me to.
Q     Did you go to Delgado?
A     Yes, I did.
Q     Were you treated for any disease?
A     A yeast infection.
Q     Were you treated for gonorrhea?
A     No, I wasn't.
```

145.    Right after Wharton testified, the prosecutors tried to call L.B., now seven years old, as a witness to identify Brown as her rapist.

146.    Outside the jury's presence, L.B. answered preliminary questions from the court and counsel about her competency.

147.    But when the jury was brought in, L.B. started crying, so much so that her nose began to bleed.

148.    Judge Reed had L.B. removed from the courtroom and instructed the jury not to be influenced or "distracted" by what happened.

149.    The prosecutors then re-called L.B. to the witness stand, and she answered questions about her age, family, home address, and school.

150.    L.B. also testified that she knew the difference between the truth and a lie.

151.    When the examining prosecutor asked L.B. about the consequences of telling a lie, L.B. could not answer, and her nose started bleeding again.

152.     Judge Reed again had L.B. removed from the courtroom as the prosecutors called another witness.

153.     The prosecutors tried to re-call L.B. to testify a third time, but Judge Reed refused to let L.B. testify based on the perceived risk of prejudice associated with L.B.'s "dramatics."

154.     L.B. never substantively testified.

155.     Defense counsel called only one witness, L.B.'s mother Cathy.

156.     Cathy was sure that Brown had not raped her daughter, and testified about her fight with Wharton, during which he confessed to raping her daughter.

157.     Cathy testified that Wharton said, "I may be a child molester but if I did, your old man's going to serve time for it."

158.     Brown's trial lasted a day-and-a-half, with closing arguments given on December 15.

159.     ADA Teel gave the case-in-chief closing argument for the District Attorney. ADA Wolff gave the rebuttal closing argument.

160.     In rebuttal closing argument, the prosecutor argued that Wharton "tested negative" for gonorrhea, and that the "only" person who "had gonorrhea" was "daddy Patrick."

161.     The prosecutor also argued that the jury should not punish L.B. by acquitting Brown because of what Cathy testified Wharton said. The prosecutor characterized Wharton's statements as substantively untrue, but simply intended to hurt Cathy's feelings during their fight.

162.     During deliberation, the jury asked the court to provide them definitions for various terms bearing on the prosecutors' charge of aggravated rape against Brown and lesser offenses.

163.     The jury also asked the court "what happens if the jury can't get 10 votes either way, guilty or not guilty?"

164.    Later that night, the jury convicted Brown of aggravated rape as charged, and he ultimately received a sentence of life imprisonment with the possibility of parole, probation, or suspension of sentence.

165.    On information and belief, the jury was non-unanimous in voting to convict Brown.

166.    The jury's verdict form instructed that only ten of them needed to agree to convict, and the jury's questions to the court suggest that they struggled to reach ten consistent votes.

167.    The Louisiana Court of Appeal for the Fourth Circuit affirmed Brown's conviction.

168.    In its analysis, the Louisiana Fourth Circuit explained that there was sufficient proof to convict Brown because medical evidence showed that L.B. had contracted gonorrhea and "Brown had previously been infected with the same disease."

169.    The District Attorney's failure to disclose evidence to Brown's defense counsel materially impacted the jury's deliberations, the resulting guilty verdict, and the Fourth Circuit Court of Appeals' decision to affirm the conviction.

170.    For example, at trial, the defense had no one to corroborate Cathy's story of Wharton admitting to raping L.B.

171.    Had Brown's defense counsel known that additional witnesses heard Wharton say that he "f**ked" six-year-old L.B., Brown's defense counsel would have called these witnesses in the defense case at Brown's trial.

172.    This corroborating witness testimony would have enhanced Cathy's credibility, especially because her account aligned with what Carolyn Wharton and Miko Deloney reported hearing Wharton say.

173.    This corroborating witness testimony would have enabled defense counsel to challenge and more vigorously cross-examine Wharton on his contrary and self-serving testimony

and police witnesses on why they failed to arrest, or at least more seriously interrogate, a man who proclaimed to having "f**ked" a six-year-old girl.

174.    This corroborating witness testimony also would have undermined the integrity and thoroughness of the police investigation and the District Attorney's decision to prosecute Brown.

175.    This corborating witness testimony, in conjunction with the information that Det. Carter had told Lamar Wharton to get tested for gonorrhea, would have enabled the defense to undermine Det. Carter's credibility about her testimony that Patrick Brown was the only suspect.

176.    The prosecution's case would not have depended on a he-said, she-said between Cathy, who jurors likely perceived as an interested witness because her boyfriend was the defendant, and Wharton, who jurors may have incorrectly perceived as a disinterested bystander based on the prosecutor's characterizations and argument.

177.    Similarly, had Brown's defense counsel known that Cathy tested negative for active gonorrhea days after her daughter tested positive, defense counsel could have also used this evidence to cross examine many of the prosecution's witnesses (like doctors and police) and to vigorously argue against the prosecutors' theory in closing.

178.    Much of the State's case hinged on Brown's positive test for gonorrhea *antibodies*, while the other men in the household tested negative for *active* gonorrhea. The State used this evidence to suggest to the jury that Brown was the only person who could have had gonorrhea in February 1994, when L.B. tested positive.

179.    But because Cathy admitted that she and Brown were sexually active, it makes no sense that Brown would have shared an active gonorrhea infection with L.B., but not his adult sexual partner.

180.    According to the prosecution's notes, NOPD Det. Cathey Carter told Lamar

28

Wharton and Lawrence Brown to get tested for gonorrhea at Delgado Clinic. But this information was not disclosed to the defense.

181.    Instead, NOPD and the prosecutors elicited testimony from Wharton and Lawernce Brown that led the jury to believe both men went to get tested on their own. In light of Det. Carter's testimony that she never had any other suspects, this withheld information was material.

182.    As the U.S. Supreme Court held in *Kyles*, confidence in the verdict cannot survive when suppressed evidence would have entitled a jury to find, among other things, "that the most damning physical evidence was subject to suspicion [and] that the investigation that produced it was insufficiently probing."

183.    That is especially true in Brown's case because the jury was already split during deliberations and, on information and belief, only ten jurors voted to convict.

**NOPD withheld material favorable to Brown and fabricated false evidence against him.**

184.    On information and belief, NOPD Defendants were aware of the exculpatory witnesses described above.

185.    On information and belief, no NOPD Defendant disclosed the exculpatory witnesses to Brown or his legal team.

186.    NOPD Defendants were aware that Det. Carter told three suspects to get tested for gonorrhea at Delgado clinic.

187.    Det. Carter testified at trial that she never suspected anyone besides Patrick Brown, but that was untrue.

188.    No NOPD defendant disclosed this information to Brown or his legal team.

189.    The NOPD Defendants also used an unconstitutionally suggestive fill-in-the-blanks, "Mad-Libs"-style form with six-year-old L.B.:

A Letter

Dear *Patrick :*

I felt *Petrilits*
when you *sad*
I wanted to *cry*
when you *your Petnutsinme ,*
I felt *mad*
when you told me *don't tell*
You told a lie when you said *you didn't*

I won't let you *lie* anymore!
I know I am *mad at you*
When I think about you I feel *sad* because *I*
*don't like*. I want to feel *good*
*you*
about you. I want to feel *good*
about myself. I know *Patrick* are to blame for what
happened and how I feel now.
When you *Raped me*, you broke rules about how
adults are supposed to treat me. I feel *Sad*
because you broke those rules.
I just wanted to let you know all this.

190.     This form was unconstitutionally suggestive in that the NOPD officer wrote in the blanks, not the child.

191.     This form was unconstitutionally suggestive in that the accused (here, Brown) "told a lie" is part of the pre-printed portion – there is no option for the accused *not* lying.

192.     This form was also more than just suggestive; it constituted fabricated, false evidence.

193.     That is because the written-in words were not the words of L.B.

194.     L.B. did not say "petnuts" or "penis."

195.     Neither of these words were words she used for male genitalia at the time.

196.     L.B. did not say "raped me."

197.    That was not a word she knew at the time.

198.    Thus, NOPD Defendants fabricated a letter that supposedly was from L.B. to Brown, falsely stating that L.B. said that Brown put his "petnuts" in her and "raped" her.

### OPDA secured Brown's conviction by use of a fake subpoena against a six-year-old child.

199.    OPDA was sued over its use of "fake subpoenas": forms describing themselves as subpoenas that were designed to elicit witness interviews, but which had no judicial approval.[8]

200.    On March 14, 1994, OPDA prosecutor David Wolff sent a letter to six-year-old L.B.

201.    His letter said "[a]ttached to this letter is a subpoena requesting you to appear in my office at 619 S. White Street on March 19, 1994, at 11:30 a.m."[9]

202.    At the bottom of the letter, it said "Enclosed: Subpoena."

203.    Attached was the following document:



204.    That document looked very official, but it was <u>not</u> a subpoena.

---

[8] Charles Maldonado, New Orleans DA Jason Williams settles fake subpoena lawsuit; agrees to be placed under monitor

[9] Brown_Patrick_20150925_Full File scanned.pdf at 416.

205.    It listed in large, bold type the words "Criminal District Court for the Parish of Orleans" even though it was not issued by that court.

206.    It said that the six-year-old child was "NOTIFIED to appear" to "testify."

207.    It said that the six-year-old child was to appear "in the Criminal District Court," but it provided the address of the OPDA office, not the Court.

208.    The use of such fraudulent and coercive process was part of what caused J.B. to be so terrified to take the stand, such that she began spontaneously bleeding.

### *After Brown's conviction, the District Attorney's unconstitutional policies and practices continued while Brown, now considered a child rapist, lived in America's bloodiest prison.*

209.    After his conviction, Brown was briefly held at the Orleans Parish Prison and then the Elayn Hunt Correctional Center.

210.    On May 1, 1995, Brown was transferred to the Louisiana State Penitentiary at Angola, where he remained until his exoneration in 2023.

211.    Angola is known as American's bloodiest prison and is one of the most dangerous prisons in the nation.

212.    For work, most people incarcerated at Angola pick crops in the sweltering Louisiana heat, while surrounded by intimidating wolf-dog hybrids.

213.    The *highest* wage most incarcerated people can earn for their work is statutorily set at twenty cents per hour, with incarcerated people in certain industrial, agricultural, or other vocational programs allowed to earn up to forty cents per hour.

214.    Most people incarcerated at Angola earn only two cents per hour.

215.    If incarcerated people are perceived as refusing to work, or not working fast enough, prison guards force those people into solitary confinement.

216.    Angola is well known for its lack of medical care, high rates of suicide, and other

32

conditions that contribute to high rates of deaths or brutality among those incarcerated there.

217.    Because of his sex-offender status, Brown's time at Angola was even tougher than what other incarcerated people experience.

218.    Incarcerated people convicted of sex offenses are often targets for physical or sexual assaults and tormented by other people in prison. As a result, people convicted of sex offenses live in constant fear for their lives and their safety while incarcerated.

219.    Unlike other people incarcerated at Angola, and because of his sex offender status, Brown was not allowed to take courses in the Vocational and Educational programs, including Welding, Carpentry, Auto Mechanic, HVAC, and Electrical.

220.    As a result, Brown missed invaluable job training that he could have used to secure a job upon his release. He also missed increased compensation while incarcerated, as well as basic skills- and productivity-development tasks that help inmates cope generally with incarceration.

221.    Brown was also prohibited from participating in the Angola Rodeo, which is another opportunity for incarcerated people to earn money and interact with friends and family.

222.    As a convicted sex offender, Brown had limited visitation privileges.

223.    Visitation is crucial to maintaining familial or social ties and stability that improve an incarcerated person's mental and physical wellbeing, ensure continued commitment to their community, and decrease the likelihood of recidivism upon release.

224.    While incarcerated, Brown had an excellent institutional and disciplinary record; essentially, he was a model inmate.

225.    Brown was a "Class C trustee," which is a special designation for sex offenders who would otherwise be entitled to preferred "trustee" status, but for their sex-offense convictions.

226.    But because he was a Class C trustee, Brown still had the same restrictions as a

"Medium Custody" offender and was required to stay inside a secure compound within Angola at nearly all times.

227.    When Brown was outside the secure compound, he was always accompanied and supervised by an armed guard.

228.    In other words, Brown was deprived of even the very little autonomy other people incarcerated at Angola receive.

229.    To this day, Brown struggles with post-traumatic stress disorder, anxiety, and other mental health issues stemming from his time living inside Angola.

230.    In the years after the Louisiana Fourth Circuit affirmed Brown's conviction in 1999, L.B.—now more grown up—began contacting the District Attorney, the Orleans Parish Criminal District Court, and others to say that Brown did not rape her and that the wrong man was in prison.

231.    Between 1994 and 2023, L.B. wrote "more than 100 letters to prosecutors and court officials to tell them Brown had not raped her."[10]

232.    For example, on May 11, 2002, when L.B. was 14, she wrote a letter that "Brown has had to serve time in jail for a crime he did not commit" and that "Patrick Brown is and always will be a good man."

233.    On July 1, 2015, when L.B. was 21, she signed and sent the District Attorney an affidavit naming Wharton as her rapist; L.B. swore "Patrick Brown was not the person who did any harm to me. I am truly stating that Lamar Wharton was the person who raped me in 1993-1994. I have no problem or issues with Patrick Brown being released from prison."

234.    With Brown already in prison, L.B.'s letters were either ignored or discarded.

---

[10]    Jillian Kramer, *A rape survivor told law enforcement agencies they had the wrong man for decades. They ignored her*. Times-Picayune (May 8, 2023).

235.    L.B. also tried to speak face-to-face with the District Attorney or ADAs, but if she showed up unannounced to the District Attorney's office to explain Brown's innocence, she was turned away and told to leave.

**_Brown spent 29 years, 2 months, and 17 days in jail or prison for a crime he did not commit._**

236.    L.B.'s repeated pleas that the District Attorney had convicted and imprisoned the wrong man were ignored, until a change in administration.

237.    In 2022, following a recent change in Louisiana law, Brown filed a post-conviction relief application asserting that he was factually innocent of the aggravated rape for which he was convicted in 1994.

238.    In response to Brown's application, the current District Attorney's office more carefully reviewed the facts underlying Brown's conviction and spoke directly with L.B, with Brown's defense attorney, and with medical professors to better understand the circumstances of Brown's conviction.

239.    After his office's review, the current District Attorney concluded that Brown was convicted on the "hearsay testimony" of two people who interviewed L.B. (a doctor and NOPD Detective Cathey Carter) and on medical evidence that was "not conclusive."

240.    According to the District Attorney, Brown was "wrongly convicted."

241.    The District Attorney agreed that Brown is "factually innocent of the crime for which he has spent over 29 years in prison."

242.    On May 8, 2023, Orleans Parish Criminal District Court vacated Brown's conviction on the grounds that Brown had proven his factual innocence by clear and convincing evidence, and he is factually innocent of the crime.

243.    The same day, the District Attorney dismissed all charges against Brown.

244.    Brown spent 29 years, 2 months, and 17 days imprisoned for a crime he did not commit.

## CLAIMS FOR RELIEF

245.    Brown asserts two claims against the Orleans Parish District Attorney.

### Count One – Violation of 42 U.S.C. § 1983 and the U.S. Constitution
### (All Defendants)

246.    Brown realleges and incorporates all of the preceding paragraphs.

A.    *Monell* claim regarding OPDA violations.

247.    The Orleans Parish District Attorney is responsible for all policies, practices, and customs of the office—whether formal or informal, written or unwritten.

248.    Before Brown's wrongful prosecution, conviction, and nearly-30-year imprisonment, the District Attorney had an objectively wrong written *Brady* policy that all ADAs were officially required to follow.

249.    The District Attorney also routinely failed to train ADAs on their constitutional obligations to disclose information to criminal defendants and expected prosecutors to learn on the job without providing them the information, tools, or resources to effectively do so.

250.    The District Attorney also customarily downplayed, if not outright criticized, the importance of *Brady* in ensuring due process and fair trials for criminal defendants, which both expressly and subliminally discouraged prosecutors from disclosing favorable information to the defense, lest that information ultimately result in an acquittal.

251.    By negatively considering any acquittal a "loss," rather than the right and just result of a failure to prove a person's guilt beyond a reasonable doubt, the District Attorney expressly and subliminally prioritized convictions over justice, even if that meant convicting and imprisoning innocent people for the sake of office statistics.

36

252.     The District Attorney knew, or at the very least deliberately ignored, that these policies, practices, and customs were likely to result in wrongful convictions and imprisonment for innocent people because the fundamental test of whether information must be disclosed under *Brady* and its progeny turns on whether information favors the defendant in the sense that it bears on a defendant's guilt or innocence.

253.     The District Attorney knew, or at the very least deliberately ignored, that these policies, practices, and customs were resulting in wrongful convictions because state and federal appellate courts often vacated or reversed convictions after finding *Brady* violations.

254.     Despite this, the District Attorney did not use judicial decisions finding *Brady* violations to improve his policies, practices, or customs or to train prosecutors to better understand when disclosure was constitutionally required.

255.     Instead, the District Attorney openly called judicial findings of *Brady* violations "ridiculous," while prosecutors continued to commit more *Brady* violations.

256.     The *Brady* violations in Brown's case were not unique. He is one of many former criminal defendants wrongly convicted and imprisoned because prosecutors failed to disclose favorable evidence to defense counsel before trial.

257.     On information and belief, the ADAs who prosecuted Brown will testify that they abided by the District Attorney's written policy, standard practices, and regular customs in making disclosures—or failing to disclose information—to defense counsel in Brown's case.

258.     If the District Attorney had formalized a legitimate and accurate written *Brady* policy, trained prosecutors on the contours and potential nuances of how *Brady* information practically manifests itself in particular cases, or simply encouraged, rather than expressly discouraged, prosecutors to err on the side of disclosure, Brown and other people like him would

37

not have been wrongly convicted and imprisoned.

259.    The OPDA violations violated Brown's rights under *Brady/Giglio et al.,* his right to be free from malicious prosecution, and his substantive due process right to be free from arbitrary and conscience-shocking conduct that contravene fundamental canons of decency and fairness.

260.    The District Attorney is liable to Brown for his wrongful conviction and imprisonment, and Brown has suffered extensive and practically immeasurable damages in the form of his loss of freedom, lost wages and loss of earning capacity, loss of enjoyment and quality of life, loss of consortium based on his intensely strained familial and social relationships, pain and suffering, physical injuries, and other damages to be proven at trial.

B.    Individual and *Monell* claim regarding OPDA use of fake subpoenas.

261.    Article 66 of the Louisiana Code of Criminal Procedure allows prosecutors to seek a subpoena from a court ordering a witness to meet with the prosecutor for questioning.

262.    A prosecutor need only show "reasonable grounds" to justify the subpoena's issuance.

263.    Another judge of this Court has held that OPDA attorneys "side-stepped the judicial process to the extent that they created and disseminated 'subpoenas' to compel witnesses to meet with them outside of court."[11]

264.    For that reason, the Court held that OPDA attorneys "are not entitled to absolute immunity for their alleged role in creating or delivering 'subpoenas' to victims and witnesses of crimes."[12]

---

[11] *Singleton v. Canizzarro*, 17-cv-10721, R. Doc. 116 at 11 (E.D. La. Feb. 28, 2019).
[12] *Singleton v. Canizzarro*, 17-cv-10721, R. Doc. 116 at 14 (E.D. La. Feb. 28, 2019), *affirmed* in 956 F.3d 773, 783-784 (5th Cir. 2020) ("Defendants' use of the fake subpoenas in an attempt to obtain information from crime victims and witnesses outside the judicial context falls into the category of investigative conduct for which prosecutors are not immune.")

265.    The Court further held that "allegations that prosecutors manufactured 'subpoenas,' deliberately side-stepping judicial oversight of the subpoena process, appears to this Court to represent a breed of official misconduct. . . . [these] claims sufficiently shock the conscience such that they allege a constitutional violation."[13]

266.    At the relevant times, OPDA implemented or tolerated a pattern and practice, as well as plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of OPDA, including the conscience-shocking and due-process-violating activity of the use of fake subpoenas.

267.    The use of fake subpoenas was not only condoned but directed by top prosecutors and the DA himself.

268.    With regard to individual liability, Defendant Wolff personally issued a fake subpoena to a six-year-old child, among other witnesses in this case, despite knowing that he did not have any such authority.

C.    *Monell* claim regarding NOPD violations.

269.    At the relevant times, the City of New Orleans through NOPD implemented or tolerated a pattern and practice, as well as plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of NOPD officers, including the use of improper and suggestive identification procedures, such as the "mad-libs" style form used with L.B., and failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court.

270.    The fact that the improper and suggestive identification procedures were NOPD policy is evidenced by the fact that they were on a pre-printed form.

---

[13] *Singleton v. Canizzarro*, 17-cv-10721, R. Doc. 116 at 25-26 (E.D. La. Feb. 28, 2019).

271.    These widespread policies and practices were allowed to flourish because NOPD directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of NOPD employees, and/or failed to adequately punish, discipline, and deter prior instances of misconduct. In this way, NOPD violated Plaintiffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

D.    NOPD Officers' Constitutional Violations

272.    Defendant Detective Carter and/or Doe Handwriting NOPD Officer violated the Constitution by:

i.    The use of improper and suggestive identification procedures;

ii.    By fabricating evidence such as the handwriting that Brown "raped me"; and

iii.    By failing to disclose *Brady/Giglio* or otherwise favorable material.

**Count Two – Violation of the Louisiana Constitution**
**(All Defendants)**

273.    Brown again realleges and incorporates all of the preceding paragraphs.

274.    Like the U.S. Constitution, the Louisiana Constitution guarantees a person's right to be secure in his person and effect from unreasonable seizure, to equal protection of the law, to due process of law, to be free from discrimination, to be free from cruel, excessive, or unusual punishment, and to additional unenumerated rights. See La. Cost. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, & 24.

275.    The same conduct that violated Brown's federal constitutional rights also violated the rights that the Louisiana Constitution guarantees to Brown.

276.    These violations of the Louisiana Constitution caused Brown to be wrongfully convicted and imprisonment for a crime he did not commit, which further caused him to suffer the physical, emotional, and pecuniary damages described throughout this complaint.

### Count Three – State Law Torts of Negligence and Abuse of Process
### (Wolff, Carter, Doe NOPD Handwriting Officer, Doe NOPD Officers)

277.     Plaintiff realleges and incorporates each and every foregoing paragraph.

278.     Wolff failed to take due care, and instead was negligent and/or grossly negligent in using a fake subpoena in the case against Brown.

279.     The use of a fake subpoena on a six-year-old child was a coercive measure that helped prevent L.B. from testifying truthfully that Brown did not rape her.

280.     Detective Carter failed to take due care, and instead were negligent and/or grossly negligent, in their use of an improperly suggestive identification process, fabrication of evidence, and failure to disclose *Brady* material.

281.     It was foreseeable that, as a result of such negligence, Brown would be wrongfully detained and incarcerated, and in fact, Brown was wrongfully detained and incarcerated and served almost thirty years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

282.     To succeed on a Louisiana abuse of process claim, a plaintiff must show an improper willful act in the use of a legal process and the existence of an ulterior purpose.[14]

283.     This Court has already held that allegations "that the Defendants flouted the investigative subpoena process provided by Article 66 of the Louisiana Code of Criminal Procedure by serving 'subpoenas' on several of the Plaintiffs with the ulterior purpose of avoiding judicial oversight. Such allegations amount to an abuse of process."[15]

284.     Thus, Wolff's use of a fake subpoena was also an abuse of process.

---

[14] Singleton v. Canizzarro, 17-cv-10721, R. Doc. 116 at 40 (E.D. La. Feb. 28, 2019), citing Mills v. City of Bogalusa, No. 13-5477, 2016 WL 2992502, at *14 (E.D. La. May 24, 2016) (citing Waguespack, Seago and Carmichael v. Lincoln, 768 So. 2d 287, 290–91 (La. App. 1 Cir. 2000)).
[15] Singleton v. Canizzarro, 17-cv-10721, R. Doc. 116 at 41 (E.D. La. Feb. 28, 2019).

### Count Four – Vicarious Liability for State Law Torts
### (Williams, City of New Orleans)

285.    Plaintiff realleges and incorporates each and every foregoing paragraph.

286.    At all relevant times, Wolff was acting within the scope of his employment and as agent for OPDA.

287.    At all relevant times, the NOPD officer defendants were acting within the scope of their employment and as agents for NOPD.

288.    Consequently, the City of New Orleans and OPDA are liable under the doctrine of *respondeat superior* for any and all tortious actions of their employees and agents.

### RELIEF REQUESTED

289.    Brown demands a jury trial on all claims.

290.    Brown respectfully requests that judgment be entered in his favor and against the defendant, finding that the defendant violated 42 U.S.C. § 1983, the U.S. Constitution, and the Louisiana Constitution and awarding all damages available under the law (including punitive damages against individual defendants), pre- and post-judgment interest, all costs and attorneys' fees, and any other or further relief, at law or in equity, that Brown may be entitled or deserve.

Respectfully submitted,

/s/ *William Most*
William Most, La. Bar No. 36914
Caroline Gabriel, La. Bar No. 38224
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
T: (504) 509-5023
williammost@gmail.com

Chloé M. Chetta, 37070
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras St., Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
cchetta@barrassousdin.com