UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PATRICK W. BROWN,<br><br>  *Plaintiff*,<br><br>v.<br><br>JASON R. WILLIAMS, in his official capacity as Orleans Parish District Attorney,<br><br>  *Defendant*. | Civil Action No. 24-00423<br><br>Section R<br>Judge Sarah S. Vance<br><br>Division 4<br>Magistrate Judge Karen Wells Roby |

**REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

  Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), through undersigned counsel, respectfully submits this reply memorandum in support of his motion seeking dismissal of Plaintiff Patrick Brown's claims pursuant to Federal Rule of Civil Procedure 12(b)(6), Doc. No. 11, in order to respond to arguments made in Mr. Brown's opposition memoranda, Doc. Nos. 18 and 29.

  **REPLY TO DOC. NO. 18 (PROSECUTORS ACT ON BEHALF OF THE STATE)**

**I.** **The Fifth Circuit's *en banc* decision in *Daves* establishes a new legal standard that abrogates any prior circuit that is inconsistent, including *Burge*, and compels the conclusion that Louisiana district attorneys act on behalf of the state when they prosecute crimes against the state.**

  Mr. Brown correctly acknowledges that "[t]he question . . . is whether the holding in *Burge* is so incompatible with the holding in *Daves* . . . that *Burge* must be deemed implicitly overruled." Doc. No. 18 at 7. For the reasons explained further in its opening brief, OPDA respectfully submits that *Burge* is indeed incompatible with *Daves* and has been implicitly overruled. *Burge* cited, but did not discuss, and apparently gave no weight to, the language in the Louisiana Constitution providing that "a district attorney has charge of every criminal prosecution by the State in his

district." *See Burge*, 187 F.3d at 469. Yet *Burge* placed significant weight on its finding that a district attorney is an "independent" and "virtually autonomous local government official." *See id.* at 469–70. *Burge* also relied on its "infer[ence]" that "the office of the district attorney as an independent local government entity" would be vicariously liable "for the torts of a district attorney's employees under state law." *See id.* Thus, *Burge* gave no weight to the factor that was deemed most important in *Daves* and relied heavily on two factors (funding and local autonomy) that were cited by the ***dissenting*** judges in *Daves* and disapproved by the majority.

Mr. Brown insists that *Burge* "is not incompatible with *Daves*" and "can be reconciled with *Daves*." Doc. No. 18 at 5, 8. However, his only attempt to reconcile the two decisions is to point out that *Daves* concerned different officials in a different state. *See id.* at __. This does not reconcile anything. *McMillian* also concerned different officials in a different state (Alabama sheriffs), yet it established binding precedent as to how lower courts should analyze the same issues with respect to other officials in other states. The same is true of *Daves*. Mr. Brown simply refuses to acknowledge the change in Fifth Circuit jurisprudence effected by *Daves*. He makes no attempt to show how *Burge*, or his own case, would turn out following the same analysis employed in *Daves*.

Mr. Brown suggests that there is no *"Daves* analysis" at all. He argues that "*Daves* merely applied the relevant analysis outlined in *McMillian*," and that it "did not purport to change that analysis, nor could it." Doc. No. 18 at 8. But this interpretation of *Daves* has already been refuted by the Fifth Circuit itself. In *Arnone v. County of Dallas County*, 29 F.4th 262, 267 (5th Cir. 2022), decided several months after *Daves*, the Fifth Circuit explained that *Daves* "***clarifies*** how to attribute a policymaker's actions under *McMillian*." (Emphasis added). And throughout the opinion, the panel cited and applied both *McMillian* **and** *Daves* to analyze the question presented— which had nothing to do with County Judges or bail schedules. *See, e.g., id.* at 268 ("Applying

2

*McMillian* and *Daves*, the district attorney acted as a state—not county—policymaker in promulgating or acquiescing to the polygraph policy."). If *Daves* were nothing more than a straightforward application of *McMillian*, there would of course be no reason to do this.

Mr. Brown's characterization of *Daves* is also belied by the fundamental disagreements among the *en banc* Fifth Circuit judges as to how *McMillian* should be interpreted and applied. The nine judges in the *Daves* majority concluded that the factors typically used to analyze Eleventh Amendment/sovereign immunity—including "the source of funding"—can be "misleading" in the § 1983 analysis required under *McMillian*. *See Daves*, 22 F.4th at 532–33. However, the four dissenting judges disagreed, arguing that "the two matters are undeniably intertwined," and that the Eleventh Amendment factors could properly be considered in the *McMillian* analysis. *See id.* at 555–56 (Haynes, J., dissenting). These differences in methodology led to different answers to the ultimate question of whether Texas county judges act on behalf of the state when making policies related to bail.

Mr. Brown's suggestion that *Daves* could not change or add to the analysis required under *McMillian* is also incorrect. It is true that the Fifth Circuit does not have the power to overrule a Supreme Court decision. But the federal circuit and district courts often disagree on how to interpret or apply Supreme Court decisions; indeed, resolving "circuit splits" is one of the Supreme Court's major roles in the federal court system. And the Fifth Circuit's *interpretation* of Supreme Court jurisprudence is indisputably binding on the district courts within its territory. As inconvenient as it is for Mr. Brown's case, *Daves* cannot simply be ignored.

Mr. Brown argues that "*Daves* did not purport to dictate what courts must consider above all else when applying *McMillian*'s factors," Doc. No. 18 at 10, but this is not a fair reading of the opinion. The majority found it essentially dispositive that the Texas Constitution vests county

courts with the judicial power of the state. *See Daves*, 22 F.4th at 537–38. The dissenting judges pointed out various factors that, in their view, show that Texas county judges act on behalf of their counties: for example, that "the County Judges are paid by the county"; that "the fees they collect go straight into the county coffers"; that they "have significant local autonomy"; and that their "primary area of concern is . . . local." *See id.* at 556–57. Yet the majority found these factors to be "misleading," specifically explaining that courts should not "prioritize identifying the source of the overall funding or the primary concern of the entity or official." *See id.* at 533. This guidance from the *en banc* Fifth Circuit is not merely advisory—it establishes binding precedent as to how courts must determine which municipality an official acts on behalf of in a § 1983 lawsuit.

      Mr. Brown suggests that *Daves* is not sufficiently clear to overrule *Burge*. But *Martinelli v. Hearst Newspapers, LLC*, 65 F.4th 231 (5th Cir. 2023), which Mr. Brown cites in his opposition, explains that a Fifth Circuit decision is "implicitly overruled" if "the Supreme Court disavows the mode of analysis on which [the circuit] precedent relied." *Id.* at 234 (quotations omitted).[1] *Martinelli* also explains that "where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis, [circuit] precedents relying on that analysis are implicitly overruled." *Id.* (quotation omitted). As explained above and in the initial memorandum, the "mode of analysis" on which *Burge* relied has been disavowed in *Daves*, and the focus of the analysis had been fundamentally changed. This change is "unequivocal," and not "merely illuminating" or a "hint" of how the Fifth Circuit may rule in the future. *See id.* at 234 (quotation omitted).

---

[1] The same principle would presumably apply to a decision of the *en banc* Fifth Circuit, since an *en banc* decision has the same power to "overturn another panel's decision." *See Martinelli*, 65 F.4th at 234 (quotation omitted).

**II.     Mr. Brown's effort to defend *Burge* on its merits is unpersuasive.**

Aside from *Daves* and questions of precedent, Mr. Brown briefly attempts to defend the holding of *Burge* on the merits. *See* Doc. No. 18 at 9–12. However, these efforts only serve to illustrate the lack of support for that holding. Mr. Brown argues that "the Louisiana constitution does not vest district attorneys with state power," *id.* at 10, but this is incorrect. The Louisiana Constitution unambiguously vests district attorneys with state power by declaring that each district attorney "shall have **charge of** every criminal prosecution **by the state** in his district." LA. CONST. art. 5, § 26(B) (emphasis added). And the Louisiana Supreme Court has consistently held that "[a] district attorney is a constitutional officer who serves in the judicial branch and exercises a portion of the sovereign power of the state within the district of his office." *Bd. of Comm'rs of Orleans Levee Dist. v. Connick*, 654 So. 2d 1073, 1077 (La. 1995) (quotation omitted); *see also* Doc. No. 11-1 at 12–13 (listing cases).

With this argument refuted, Mr. Brown is left with only one argument to rely on—the Louisiana legislation providing that the state is not vicariously liable for the torts of district attorneys and their employees. *See* Doc. No. 18 at 11–12. But as discussed in the initial memorandum, *see* Doc. No. 11-1 at 25–29, considerations of liability are unhelpful and misleading. The fact that Louisiana has exercised its sovereign immunity by limiting state liability for the actions of officials such as district attorneys does not, and cannot, negate the clear constitutional language providing that district attorneys act on behalf of the state in some circumstances. Mr. Brown argues, quoting the opinion in *Smith v. Williams*, that Louisiana appellate courts have construed the legislation as "evidence of a strong legislative intent to designate Louisiana district attorneys as local officers who do not act for the State on the particular issue of their evidence disclosure policies and practices." Doc. No. 18 at 11 (quoting *Smith*, 2023 WL 2263841, at *9). But as discussed in the initial memorandum, this is simply not true. *See* Doc.

5

No. 11-1 at 28. Mr. Brown cites a single Louisiana appellate decision stating that "[t]he District Attorney's Office is not the State and the State is not liable for the acts of the District Attorney or his employees." *See Gibson v. State*, 644 So. 2d 1148, 1150 (La. App. 4th Cir. 1994). But this decision did not address whether a district attorney nevertheless *acts* on behalf of the state in prosecuting crimes. And, in any event, the Louisiana Supreme Court's holdings on this issue are controlling. *See* Doc. No. 11-1 at 12–13.

### III. Any official policies adopted by the District Attorney relating to disclosure of evidence in state-law prosecutions are an exercise of power on behalf of the state.

Mr. Brown contends that OPDA "neglects to address . . . the particular district attorney functions relevant to [his] lawsuit" and "says nothing about the role in which a district attorney acts when he adopts an internal policy or develops an internal practice of failing to identify and disclose *Brady* material and fails to internally train subordinates on their obligations under *Brady*." Doc. No. 18 at 6; *see also id.* at 14–15. This is incorrect. As explained in OPDA's initial memorandum, discovery and disclosure of evidence are merely part of the broader activity of prosecuting criminal cases; they cannot be divorced from that context and treated as separate activities. *See* Doc. No. 11-1 at 9.[2] Additionally, the Fifth Circuit has explained that policymaking is inextricably linked with the activities about which policy is being made. In *Daves*, the Fifth Circuit held that the County Judges were exercising "the judicial power of the state" in creating bail-setting *policies* (*i.e.*, bail schedules), because "the act of creating guidance for setting bail is 'inextricably linked' to the subsequent setting of bail." *Daves*, 22 F.4th at 539–40. And in *Arnone*,

---

[2] For example, the Fifth Circuit has held that a prosecutor's decisions about what evidence to disclose to the defense (including alleged nondisclosure of *Brady* material) are "intimately associated with the judicial phase of the criminal process." *Cousin v. Small*, 325 F.3d 627, 632, 635 (5th Cir. 2003). Thus, the Fifth Circuit held that "absolute immunity generally applies to *Brady* violations." *Id.* at 635.

6

the Fifth Circuit held that "[t]he district attorney's promulgating or acquiescing to a policy governing future uses of the power to seek revocation of probation or deferred adjudication is inextricably linked with his power to seek it in individual cases." *Arnone*, 29 F.4th at 270–71. Accordingly, any policies or practices adopted by Louisiana district attorneys concerning disclosure of evidence in prosecutions on behalf of the state are part of the district attorneys' exercise of state power.

      Mr. Brown suggests that if policies vary across the state, they cannot be attributable to the state. He questions "how it could be that the Orleans Parish District Attorney has such a well-established history and culture of failing to disclose *Brady* material unlike other parishes if *Brady* policies are attributable to the State of Louisiana, rather than a local policymaker unique to Orleans Parish." Doc. No. 18 at 6. As an initial matter, OPDA objects to the premise that it has a "history and culture" of *Brady* violations and is "unlike other parishes." But more fundamentally, this same argument has been specifically rejected by the Fifth Circuit. *See Daves*, 22 F.4th at 540 ("It does not matter that the schedule applies only to one county. The geographic limit of their action does not define the level of government for which the judges acted."); *Arnone*, 29 F.4th at 270 ("Arnone argues that there's a difference between a general grant of state power and its different, county-level execution, which requires a county-level policymaker. But we rejected that argument in *Daves*."). In *Arnone*, even though the Dallas County district attorney had "complete dominion over the internal policies and procedures used within his office," the Fifth Circuit nonetheless held that he "acted for the state—not county—when he promulgated or acquiesced to the polygraph policy" at issue in the case. *Arnone*, 29 F.4th at 271.

**IV.     The District Attorney's Office has not taken inconsistent positions concerning whether district attorneys act on behalf of the state when prosecuting state-law crimes.**

Mr. Brown accuses OPDA of taking "the opposite" position in other litigation. *See* Doc. No. 18 at 6–7. But there is no inconsistency in the arguments that Mr. Brown cites, and his accusation serves only to illustrate his misunderstanding of the governing law. There is no dispute that, as OPDA pointed out in the briefing in *Juluke v. Davis,* a Louisiana district attorney's office is treated under Fifth Circuit jurisprudence as an independent municipal entity for purposes of *Monell* liability. *See, e.g.*, *Burge v. Parish of St. Tammany*, 187 F.3d 452, 470 (5th Cir. 1999). But that does not answer the central question before the Court: whether the district attorney and his assistants nonetheless act on behalf of the State of Louisiana when they prosecute crimes against the state and make policies governing how those prosecutions are conducted. As explained in OPDA's opening brief, Louisiana law makes clear that district attorneys do in fact act on behalf of the state in performing these activities. And nothing in OPDA's briefing in the *Juluke* matter is inconsistent with that conclusion.[3]

**REPLY TO DOC. NO. 29 ("FAKE SUBPOENA" CLAIMS)**

**I.      Mr. Brown has not plausibly alleged that sending a purported "fake subpoena" to L.B. caused him to be wrongfully convicted.**

In his attempt to establish the necessary causation, Mr. Brown goes far beyond the factual allegations of his own complaint and asks the Court to pile speculation on top of baseless speculation. He contends that L.B. "tried over and over again—even at a young age—to tell these

---

[3] Mr. Brown also suggests that, in the *Juluke* matter, "OPDA argued that the City bears responsibility for Juluke's harms." Doc. No. 18 at 7. To the contrary—the briefing that Mr. Brown quotes was a reply in support of a Rule 12(b)(6) motion pointing out that *the plaintiff himself* had alleged that the City of New Orleans was responsible for the policies of the Orleans Parish District Attorney's Office. *See Juluke v. Davis*, EDLA Case No. 23-cv-3111, Doc. No. 99 at 1–2.

adults that they got it all wrong, and no one would listen to her." Doc. No. 29 at 6.[4] He further contends that L.B. was "surrounded by adults who would not listen to her." *Id.* Yet the Amended Complaint does not allege that L.B. ever told *anyone*, before the date of Mr. Brown's conviction, that Mr. Brown did not rape her.[5] And although he suggests that L.B. may have been confused, even Mr. Brown concedes that doctors and police understood her to be accusing him of rape. *See id.* at ¶¶ 88–93. Mr. Brown also contends that Mr. Wolff "encouraged and expected L.B. to testify, specifically, that Mr. Brown raped her." *Id.* at 7. Yet the Amended Complaint does not allege that Mr. Wolff "encouraged" or "expected" L.B. to testify to anything other than the truth as she understood it. In short, there is absolutely no basis to "infer" that Mr. Wolff pressured or coerced L.B. to implicate Mr. Brown as the person who raped her, despite her insistence to the contrary.

Moreover, even if Mr. Brown's speculative chain of inferences is accepted, his "fake subpoena" claims still make no sense. Even if Mr. Brown could show that a "fake subpoena" was used to pressure an uncooperative victim to meet with prosecutors (and he cannot), it is still fundamentally implausible that this would *prevent* her from testifying when called as a witness at trial nine months later. None of Mr. Brown's attempts to explain are persuasive. He asks to the Court to "infer that L.B. was too overcome with fear and emotion at the prospect of testifying against Mr. Brown, that she was unable to honestly testify at all." Doc. No. 29 at 7. Even if this were true, and even if it made sense,[6] it would be attributable to L.B. being called as a witness at

---

[4] By "these adults," Mr. Brown is apparently referring to doctors, police, prosecutors, and L.B.'s family members.

[5] As a factual matter, Mr. Wolff is certain that L.B. never suggested to him that Mr. Brown did not rape her. To the contrary, L.B. clearly identified Mr. Brown to him and described what he did to her.

[6] Mr. Brown has not plausibly explained why L.B. would have felt pressured to falsely implicate Mr. Brown, if he were in fact innocent, rather than testifying truthfully.

9

trial—not to a "fake subpoena" requesting a meeting with prosecutors nine months earlier. And Mr. Brown has not alleged that L.B. was unlawfully compelled to appear for trial (or even that she was compelled at all, as opposed to appearing voluntarily).

## II. Mr. Brown's claims are legally unprecedented.

Mr. Brown still has identified no precedent or authority holding that sending an allegedly unlawful subpoena to a witness could violate the Fourteenth Amendment substantive due process rights of a criminal defendant. Instead, he reveals a fundamental confusion about his claim by discussing "procedural due process." *See* Doc. No. 29 at 4. Contrary to Mr. Brown's suggestion, an alleged failure to comply with the code of criminal procedure does not establish a Fourteenth Amendment substantive due process violation.

As to his negligence claim, Mr. Brown contends that prosecutors owe criminal defendants a duty under Louisiana tort law "not to abuse or exceed their authority to obtain a conviction." Doc. No. 29 at 8. As authority for this proposition, he cites four U.S. Supreme Court decisions in criminal cases that have nothing whatsoever to do with Louisiana tort law, as well as the American Bar Association Criminal Justice Standards. *See id.* at 8. Mr. Brown argues that Mr. Wolff owed him a duty "pursuant to the United States Supreme Court precedent, ethical and professional rules of conduct for prosecutors and the Louisiana Code of Criminal Procedure." *Id.* at 8–9. But he does not cite a single decision holding, or even suggesting, that these sources establish legal duties owed by prosecutors to criminal defendants under Louisiana tort law.

## CONCLUSION

For the reasons set forth above and in OPDA's Motion to Dismiss, Doc. No. 11, and Supplemental Memorandum in Support of Motion to Dismiss, Doc. No. 24, Mr. Brown's claims against OPDA should be dismissed with prejudice.

Respectfully submitted,

 */s/ Matthew J. Paul*
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
STANLEY REUTER THORNTON ALFORD LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069
wra@stanleyreuter.com
mjp@stanleyreuter.com

*Counsel for Jason R. Williams (in his official capacity as Orleans Parish District Attorney)*