UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PATRICK BROWN ) | |
| ) | Civil Action No. 24-00423 |
| *Plaintiff*, ) | |
| v. ) | Section R |
| ) | Judge Sarah S. Vance |
| JASON R. WILLIAMS, in his official capacity as ) | |
| Orleans Parish District Attorney, et al. ) | Division 4 |
| ) | Magistrate Judge Karen Wells Roby |
| *Defendants*. ) | |
| ) | |

**Plaintiff's Opposition to Defendant David Wolff's Motion to Dismiss (R. Doc. 31)**

In 1994, plaintiff Patrick Brown was accused of raping a child. R. Doc. 20. Defendant David Wolff was the lead assistant district attorney who prosecuted Brown. *See id.* at ¶ 200. Wolff convicted Brown, and Brown spent the next thirty years in prison for a crime he did not commit.

Wolff had clear evidence that Brown was innocent. An internal prosecution pre-trial memo noted a "problem" that someone other than Brown – the victim's cousin – had confessed to the rape publicly and in graphic terms in front of multiple witnesses. R. Doc. 20 at ¶¶ 121-125. Wolff never disclosed those witnesses to the defense. *Id.* at ¶ 126.

Wolff also engaged in other misconduct: he knowingly labeled an informal, unapproved document as a "subpoena," and served it on the six-year-old crime victim to compel her to "report to David Wolff" and "testify to the truth" in his office. *Id.* at ¶¶ 199 *et seq.* But it was all fake. No court or judge approved or issued this subpoena; the District Attorney's office created it, and Wolff signed it as a way to pressure a victim to cooperate with prosecutors without going through the judicial process. *Id.*

Wolff contends that these facts do not state a claim, or alternatively that he has immunity for the issuance of the fake subpoena. But for the most part, those arguments have been rejected by the Fifth Circuit and/or a section of this Court. The motion should be denied.

1

**LAW AND ARUGMENT**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only plead enough facts—accepted as true—to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Nevarez v. Coleman*, No. 21-1855, 2023 WL 372088, at *3 (E.D. La. Jan. 24, 2023) (Vance, J.) (quoting *Iqbal*, 556 U.S. at 678). "The Court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239, 244 (5th Cir. 2009)).

**I.    The motion should be denied because issuing a fake subpoena plausibly constitutes a constitutional violation or a tort, as explained in *Singleton v. Cannizzaro*.**

Wolff's first argument is that "Mr. Brown has not adequately alleged a claim against Mr. Wolff under the Fourteenth Amendment to the U.S. Constitution, under the Louisiana Constitution, or for the state-law torts of negligence or abuse of process." R. Doc. 31-1 at 1. He does not explain his reasoning; instead, he adopts OPDA's memo (R. Doc. 24) in its entirety. For that reason, Patrick Brown incorporates his response (R. Doc. 29) by reference.

But in short, a section of this Court has already held that the Orleans Parish District Attorney's practice of issuing fake subpoenas to victims sufficiently shocked the conscience such that the plaintiffs' allegations defeated 12(b)(6) arguments. *See Singleton v. Cannizzaro*, 372 F. Supp. 3d 389, 415 (E.D. La. Feb. 28, 2019). There, Judge Milazzo explained that "Plaintiffs' allegations that prosecutors manufactured 'subpoenas,' deliberately side-stepping judicial oversight of the subpoena process, appears to… represent a breed of official misconduct." *Id.* The Fifth Circuit agreed, noting that OPDA's "use of the fake subpoenas violated Louisiana law, which requires prosecutors to channel proposed subpoenas through a court." *Singleton v. Cannizzaro*,

956 F.3d 773, 777 (5th Cir. 2020). Brown's allegations about Wolff's manufacturing and issuing a fake subpoena are almost identical to the allegations that survived 12(b)(6) in *Singleton*: both sets of documents were referred to as "subpoenas," required a witness to appear to testify before the District Attorney, falsely led witnesses to believe they had no choice but to comply, etc. *Compare Singleton v. Cannizzaro,* 17-cv-10721, R. Doc. 52 at 83 (fake subpoena), *with* R. Doc. 20 ¶¶199-208.

For similar reasons, Wolff's conduct plausibly alleges abuse of process or negligence. Prosecutors, who hold immense power in their authority to charge and convict criminal defendants, owe those defendants a duty not to abuse or exceed their authority just to obtain a conviction. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Agurs*, 427 U.S. 97 (1976); *Kyles v. Whitley*, 514 U.S. 419 (1995); American Bar Association Criminal Justice Standards, 3-2.1(b). But prosecutorial power does not and has never included the authority to unilaterally subpoena witnesses. *Singleton*, 372 F. Supp. 3d at 407. Louisiana's Code of Criminal Procedure provides that "*the court may order* the clerk to issue subpoenas" to witnesses to be questioned by prosecutors. Art. 66 (emphasis added).[1] Therefore, "[a]llegations that . . . Defendants purported to subpoena witnesses without court approval . . . describe more than a mere procedural error or expansion of authority. Rather, they describe the usurpation of the power of another branch of government." *Singleton*, 372 F. Supp. 3d at 407. As Judge Milazzo explained, "Defendants flouted the investigative subpoena process provided by Article 66 of the Louisiana Code of Criminal Procedure by serving 'subpoenas' on several of the Plaintiffs with the ulterior purpose of avoiding judicial oversight. *Such allegations*

---

[1] Code Cr. Proc. Art. 66 was amended in 1999, but the amendment applied only to service of a subpoena. *See* Acts 1999, No. 863. The requirement that a court issue the subpoena was part of Article 66's text in 1994, and now.

3

*amount to an abuse of process.*" 372 F. Supp. 3d at 423-24. (emphasis added).[2]

Thus, Wolff's violation of these duties in his rush to convict Brown of a crime committed by someone else plausibly states a claim for abuse of process or negligence. And Wolff's violation directly harmed Brown, given that the fake subpoena was part of the enormous pressure placed on the six-year-old victim. This prosecutorial pressure directly conflicted with her obligation to testify truthfully, overwhelming her with fear, and resulted in the victim's spontaneous nosebleed on the stand that prevented her from testifying. R. Doc. 20 at ¶¶ 145-151. Wolff's motion should be denied.

## II. The motion should be denied because the Fifth Circuit has already held that functionally identical fake subpoenas did not receive absolute prosecutorial immunity.

Wolff next contends that absolute prosecutorial immunity shields his use of a fake subpoena. R. Doc. 31-1 at 1-5. As he notes, the Supreme Court has set out "functional test" that distinguishes protected acts of advocacy from a "prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Id*. at 2 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). For that reason, "state prosecutors are not entitled to absolute immunity when they perform functions other than their quasi-judicial functions of 'initiating prosecutions and presenting the State's case.'" *Marrero v. City of Hialeah*, 625 F.2d 499, 507 (5th Cir. 1980), quoting *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976).

Wolff concedes that the Fifth Circuit held that Orleans Parish assistant district attorneys' uses of fake subpoenas were not protected by absolute immunity. Rejecting the very argument that Wolff makes here, the Fifth Circuit in *Singleton* held that the use of fake subpoenas was

---

[2] Although the *Singleton* defendants appealed, the Fifth Circuit declined to exercise pendant interlocutory jurisdiction over the state-law claims. *Singleton,* 956 F. 3d at 785 (5th Cir. 2020).

4

"information-gathering . . . more analogous to investigative police work than advocacy conduct." 956 F.3d at 783.

Contrary to Wolff's arguments that "[d]eveloping, securing, preparing, and presenting witness testimony at trial are quintessential prosecutorial functions," R. Doc. 31-1 at 2, the Fifth Circuit explained:

> The Supreme Court has squarely rejected this broad interpretation of absolute immunity: "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive."

*Singleton*, 956 F.3d at 782.

Six facts led the Fifth Circuit to conclude that OPDA's fake subpoenas were "investigatory functions" and not absolutely protected:

1. The fake subpoenas were used "outside of court." *Id.* at 782–83.

2. The fake subpoenas were used before trial. *Id.* at 782 n. 5.

3. The fake subpoenas were used "in an attempt to pressure crime victims and witnesses to meet with [ADAs] privately at the [District Attorney's] Office." *Id.* at 783.

4. The fake subpoenas were not used to "control witness testimony during a break in judicial proceedings." *Id.*

5. The fake subpoenas were not used to compel testimony at trial. *Id.*

As alleged in Brown's complaint, every single one of these facts also applies to Wolff's fake subpoena: it was sent outside of court and the judicial process, R. Doc. 20 at ¶¶ 200-01, before trial, *id.* at ¶ 200, in an attempt to pressure a victim, *id.*, to meet with an ADA, *id.* at ¶ 203, at the District Attorney's office, *id.* at ¶ 207, rather than to compel testimony at trial, *id.* at ¶¶ 201, 207.

Wolff argues, however, that the facts here are distinguishable from *Singleton,* because the complaint does not allege Wolff's "motive" or whether the victim was "uncooperative." R. Doc. 31-1 at 3-4. But those facts were not key to the Fifth Circuit's decision in *Singleton*, and so are not

relevant here. The motion should be denied.

### III. The motion should be denied because qualified immunity does not protect officials like Wolff who "knowingly violate the law."

Wolff alternatively argues that he is protected by qualified immunity. R. Doc. 31-1 at 5-6. But qualified immunity does not protect "those who knowingly violate the law." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (*en banc*).

Here, the Complaint alleges that "Defendant Wolff personally issued a fake subpoena to a six-year-old child, among other witnesses in this case, despite *knowing* that he did not have any such authority." R. Doc. 20 at ¶ 268 (emphasis added). That allegation is plausible, given that an assistant district attorney should be expected to have a basic familiarity with the laws, like the Code of Criminal Procedure, that apply to his work. *See Heien v. North Carolina*, 135 S. Ct. 530, 540 (2014) ("[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is dutybound to enforce.")*; People v. Kaurish*, 52 Cal. 3d 648, 666, 709 (Ca. 1990) (noting that prosecutors are "assumed to know the law"); *State v. Alford*, 818 S.E.2d 668, 678 (Ga. Ct. App.2018) ("Prosecutors are presumed to know the law.").

Even if Wolff did not knowingly violate the law, qualified immunity should still be denied because the relevant law was clearly established. Code of Criminal Procedure Art. 66 is (and always has been) clear that prosecutors must "channel proposed subpoenas through a court." *Singleton,* 956 F.3d at 777. A statute or regulation can provide the clearly established law for the purpose of qualified immunity. *See Hope v. Pelzer*, 536 US 730, 743-744 (2002) (listing a state regulation among the sources identifying the clearly established right); *Edger v. McCabe*, 84 F.4th 1230, 1240 (11th Cir. 2023) ("[T]he state statute itself in this case is clear and requires no additional construction . . . It was thus clearly established at the time of Mr. Edger's arrest that she could not demand he produce physical identification."); *Clark v. Coupe,* 55 F.4th 167, 187 (3d Cir. 2022) ("This Court has consistently considered relevant state statutes when determining if the grant

6

of qualified immunity is appropriate."); *E. D. v. Sharkey*, 928 F.3d 299, 308 (3d Cir. 2019) (citing statute to show that violation was "clearly established even without materially similar cases.").

The then-in-force version of Article 66 was passed in 1972, a full 22 years before Wolff's fake subpoena. While Judge Milazzo granted qualified immunity *Singleton,* her decision contained no analysis of whether the statute *itself* could provide the clearly established law.

Alternatively, this case falls within the narrow category of cases where clearly on-point precedent is not needed because the constitutional violation is self-evident. *See Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (reversing qualified immunity even without factually similar precedent); *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004) ("Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law."); *Reyes v. Sazan*, No. 97-0133, 2002 U.S. Dist. LEXIS 9154, at *6 (E.D. La. May 9, 2002) (Fallon, J.) ("[W]e are persuaded that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right.") It is self-evident that falsifying a subpoena to compel a *six-year-old girl's* testimony is a constitutional violation. The motion should be denied.

**IV.    The motion should be denied because the absolute and qualified immunity doctrines are contrary to the Notwithstanding Clause of the original text of Section 1983.**

Wolff's motion should also be denied because Section 1983's statutory text does not support the doctrine of absolute or qualified immunity. The original text of Section 1983 contained a "notwithstanding clause" that was later omitted in what became our modern U.S. Code.[3] But the

---

[3] This section relies substantially on the recent scholarship of Professor Alexander A. Reinert, as reflected in his forthcoming article *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 166-67. This section also relies on the research and briefing of the Institute for Justice, as reflected in its amicus brief in *Health and Hospital Corporation of Marion County v. Talevski,* 142 S. Ct. 2673 (2022). That amicus brief is available online here: https://tinyurl.com/3kjhd434

7

omitted clause still has the force of law and it directly contradicts the assumption that grounds the doctrines of absolute and qualified immunity. Thus, these doctrines are premised on the *absence* of text that we now know was actually *present*. As the Fifth Circuit's Judge Willett explains, the qualified-immunity doctrine is "flawed — foundationally—from its inception." *Rogers v. Jarrett*, 63 F. 4th 971, 979 (5th Cir. 2023) (Willett, J., concurring).

1. <u>The original version of Section 1983 contained a "Notwithstanding Clause" that does not appear in today's U.S. Code.</u>

When Congress passes new legislation, it "does not write [] on a clean slate." *United States v. Texas*, 507 U.S. 529, 534 (1993). It legislates against a backdrop of established "common law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Congress can either retain the common law's "long-established and familiar principles" or reject them. *Texas*, 507 U.S. at 534. Courts assume that Congress retains the common law unless the statutory text says otherwise. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35–36 (1983).

Since 1967, the Supreme Court has assumed that Congress intended to retain common-law principles in Section 1983. In *Pierson v. Ray,* the Supreme Court concluded that the "legislative record [of Section 1983] gives no clear indication that Congress meant to abolish wholesale all common-law immunities," so the Court granted defendants a "defense of good faith and probable cause" that existed in Mississippi's common law. 386 U.S. 547, 554, 557 (1967). This assumed-to-be-incorporated "good faith" defense evolved into the modern doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806-807 (1982) ("As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.").[4] And with each step along the path of qualified

---

[4] More recent scholarship casts doubt on whether any generally available defense of good faith for constitutional claims or common law torts existed in 1871. *See* Baude, *Is Qualified Immunity Unlawful?*,

8

immunity, the Supreme Court has explicitly relied on the supposed silence of Section 1983 to support the doctrine.[5]

So too with absolute prosecutorial immunity. In *Imbler v. Pachtman*, 424 US 409, 418-419 (1976), the Supreme Court followed *Pierson* and concluded that Congress would not have abrogated prosecutorial immunity "by covert inclusion in the general language" of § 1983.

But the Supreme Court was wrong to assume that Congress intended to incorporate common law immunities in Section 1983 because the version of Section 1983 that the Court looked at in *Pierson* – the U.S. Code – *omits* language that Congress originally passed.

The 42nd Congress passed Section 1983 as part of the Ku Klux Klan Act of 1871, and the original statutory text was reflected in the Statutes at Large and is longer than its contemporary U.S. Code counterpart. The U.S. Code version has just two relevant clauses:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall

> . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]

---

106 Cal. L. Rev. 45, 55-57 (2018); Schwartz, Joanna C., *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1801-1802 & nn.24- 26 (2018). And there is growing cross-ideological criticism of the doctrine. *See, e.g., Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring in part and concurring in the judgment) (noting his "growing concern with our qualified immunity jurisprudence."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (criticizing the Court's "one-sided approach to qualified immunity [which] transforms the doctrine into an absolute shield for law enforcement.").

[5] *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions."); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) ("Although the Court has recognized that in enacting §1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials."); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) ("The decision in *Tenney* established that §1983 is to be read in harmony with general principles of tort immunities and defenses, rather than in derogation of them."). For a more thorough treatment of the evolution of the doctrine of qualified immunity, *see* Reinert, *supra*, at 115 et seq.

Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871).

The original statute, however, had three—containing "additional significant text" where the ellipsis appears above. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 166-67 (forthcoming).

The additional clause said that government officials "shall, <u>any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding</u>, be liable" for constitutional violations. Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added).[6]

Two key phrases—first, "custom[ ] or usage of the State" and second, "to the contrary notwithstanding" are essential to understanding the "Notwithstanding Clause."

The 42nd Congress understood "usage or custom" to be the common law itself. *Strother v. Lucas*, 37 U.S. 410, 437 (1838). Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means a right by common law." *Id.*[7] The original text also said that officials will be liable for constitutional violations "notwithstanding" any "contrary" common-law principles. The ordinary public meaning of "notwithstanding" is the same today as it was in 1871: "notwithstanding" means "[w]ithout opposition, prevention, or obstruction from,"

---

[6] That language can be seen highlighted in an authentic copy of the Civil Rights Act of 1871, certified by the National Archives and Records Administration on August 19, 2022, attached as Exhibit A.

[7] *See also Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law . . . in each [state]."); *Western Union Telegraph Co. v. Call Pub. Co.,* 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs").

The legislative history of Section 1983 confirms this common understanding of "custom and usage" from 1871. For example, "Senator Thurman, speaking in opposition to Section 1 of the 1871 Act (what is now Section 1983), clearly understood that 'custom or usage' was equivalent to 'common law.'" *Reinert*, 111 Calif. L. Rev. at 167. In fact, while expressing his concern over "how comprehensive [the statute's] language is," Senator Thurman was alarmed that an official could be liable for any "deprivation under color of law," which, in his words, included any "'custom or usage' which has become common law." Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871) (available online at https://tinyurl.com/yud52f7d). So Senator Thurman, understood that when the 42nd Congress used the phrase "custom[ ] or usage of the State," it meant the common law of each state.

or "in spite of." Complete Dictionary of the English Language 894 (Webster's 1886); *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or "without prevention or obstruction from or by"); *see generally* Bryan A. Garner, *Garner's Modern English Usage* 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day.").[8] This plain-English understanding of the "Notwithstanding Clause" is consistent with the context. As Reinert observes, some "the very same people who served in the rebel army were also serving as judges in southern states. It would have been passing strange, then, for the very same Congress to permit liability under Section 1983 to be limited by judge-made law created by state court judges." *Reinert*, 111 Calif. L. Rev. at 175.

In short, the Notwithstanding Clause means that the common law does *not* prevent persons from Section 1983 liability. *Id.* at 167–68 ("Its implications are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983."). As Judge Willett puts it, the "language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations. Rights-violating state actors are liable—period—*notwithstanding* any state law to the contrary." *Rogers,* 63 F.4th at 971 (Willet, J., concurring); *see also Erie v. Hunter*, 21-cv-267-BAJ-RLB at fn. 2 (M.D. La. May 31, 2023) (Notwithstanding Clause shows that "qualified immunity's doctrinal underpinning—that 'no evidence' suggests that the Reconstruction Congress meant to abrogate common law immunities when it fashioned 42 U.S.C. § 1983—is a *fiction*"); *Green v. Thomas*, 23-cv-00126, R. Doc. 34 (S.D. Miss., May 20, 2024) ("If this is true, we've all been applying the wrong version of the statute.")

---

[8] Many contemporaneous dictionaries confirm this meaning. *See, e.g., Etymological Dictionary of the English Language* 344 (Chambers's 1874) ("not standing against or opposing; nevertheless."); 2 A New Dictionary of the English Language 1351 (1837) ("Not opposing, resisting, hindering, preventing.").

11

2. <u>Removing the Notwithstanding Clause in the Revised Statutes of 1874 did not change the law's substance.</u>

In determining what a law says, the current edition of the United States Code is "prima facie" evidence of the law's text. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 448 (1993) (citing 1 U. S. C. § 204(a)). But the original Statutes at Large provides the actual "legal evidence of laws." *Id.*(quoting 1 U. S. C. § 112); *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("[T]he Code cannot prevail over the Statutes at Large when the two are inconsistent." (quoting *Stephan v. United States*, 319 U.S. 423, 426 (1943)).

Relevant here, shortly after passing the Ku Klux Klan Act of 1871, the 43rd Congress compiled the Revised Statutes of 1874 an effort "to revise, simplify, arrange, and consolidate all statutes of the United States." Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library J. 213, 218 (2020) (cleaned up).

But after years of trying with unsatisfactory results, Congress tasked Thomas Jefferson Durant (a D.C. lawyer not involved in the initial drafting) to strike out any provision that substantively changed the law, but to keep "mere changes of phraseology not affecting the meaning of the law." 2 Cong. Rec. 646, 648 (1874); Ralph H. Dwan & Ernest R. Feidler, *The Federal Statutes—Their History and Use*, 22 Minn. L. Rev. 1008, 1013 (1938). Congress intended "to preserve absolute identity of meaning" in the law, so any change, "however minute," was simply meant to miniaturize and condense the law. 2 Cong. Rec. 4220 (1874); *see also* 2 Cong. Rec. 129 (1873) ("We have not attempted to change the law, in a single word or letter, so as to make a different reading or different sense.").[9] The 43rd Congress passed Durant's revisions as the

---

[9] This was true for omissions, too, which the 43rd Congress viewed as a necessary tool "to strike out the obsolete parts and to condense and consolidate." 2 Cong. Rec. 129 (1873). Omissions did not substantively change the law. By statute, the drafters were directed to, and did, provide marginal comments to any substantive edits—yet they left no marginal comments with their edits to Section 1983. *See* U.S. Statutes at Large, Volume 14 (1865-1867), 39th Congress. U.S. Statutes at Large, Volume 14 (1865-1867), 39th Congress.

Revised Statutes in 1874, which later became the U.S. Code.

Because Congress explicitly intended *not* to change the substantive provisions of the law, omitting the Notwithstanding Clause in 1874 did not alter the 42d Congress's original decision to abrogate the common law from Section 1983. *See United States v. Welden*, 377 U.S. 95, 98 fn.4 (1964) (when Congress decides to "revis[e] and consolidat[e] the laws," it does not change the law's effect unless Congress explicitly says so); *Watt v. Alaska*, 451 U.S. 259, 266–67 (1981) (explaining that when Congress wants to repeal or change a statute, it must do so with "clear and manifest" intent).[10] It makes sense, then, that the U.S. Supreme Court has already viewed the omission of two other Notwithstanding Clauses from other civil rights statutes as non-substantive changes. For example, In *Jones v. Alfred H. Mayer Co.*, the Supreme Court viewed the omission of another Notwithstanding Clause (in Section 1982) as a non-substantive change. 392 U.S. 409, 422 n.29 (1968). The Court recognized that the Notwithstanding Clause was "obviously inserted" to "emphasiz[e] the supremacy of the 1866 statute over inconsistent state or local laws." *Id*. And later, when "[i]t was deleted" in the Revised Statutes, the Court presumed the omission was only to remove perceived "surplusage." *Id*.; *see also The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883).

So too with Section 1983. The 1871 Congress was explicit in legislating that persons can be liable for Section 1983 violations in spite of any contrary common law doctrines. Omitting that language in 1874 did not change the law. Qualified and absolute immunity rest on the presumption that the 1871 statute was silent about the common law. But the statute was *not* silent—it explicitly rejected any common law defenses. Judge Willett explains that "the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law

---

[10] In other words, to incorporate the common law back into Section 1983, the Revised Statues would have needed to include some form of positive text about the common law. *See* Reinert, 111 Calif. L. Rev. at 169–71 (explaining that the Notwithstanding Clause's removal was "not the product of any positive lawmaking").

13

immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*." *Rogers*, 63 F.4th at 980. He sums this up as "game-changing arguments, particularly in this text-centric judicial era when jurists profess unswerving fidelity to the words Congress chose. . . the doctrine does not merely *complement* the text—it brazenly *contradicts* it." *Id*. at 980-981.

"Only the written word is the law." *Bostock v. Clayton Cnty*., 140 S. Ct. 1731, 1737 (2020). And "[f]idelity to text will sometimes require overturning atextual precedent." *Hamilton v. Dallas County,* 21-10133 (5th Cir. 2023, *en banc*) (Ho, J., concurring). Because the original statutory text of Section 1983 shows that the presumption underlying qualified and absolute immunity is wrong, this Court should deny those immunities, as Congress intended.

## CONCLUSION

Fort the reasons herein, Defendant Wolff's motion should be denied.

Respectfully submitted,

/s/ *William Most*
Caroline Gabriel, La. Bar No. 38224
William Most, La. Bar No. 36914
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
T: (504) 509-5023
williammost@gmail.com

and

Chloé M. Chetta, 37070
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras St., Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
cchetta@barrassousdin.com