UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PATRICK BROWN ) | |
| ) | Civil Action No. 24-00423 |
|     *Plaintiff*, ) | |
| v. ) | Section R |
| ) | Judge Sarah S. Vance |
| JASON R. WILLIAMS, in his official capacity as ) | |
| Orleans Parish District Attorney, et al. ) | Division 4 |
| ) | Magistrate Judge Karen Wells Roby |
|     *Defendants*. ) | |
| ) | |

**Plaintiff's Opposition to Defendant Cathey Carter's Motion to Dismiss (R. Doc. 32)**

In 1994, plaintiff Patrick Brown was accused of raping a child. R. Doc. 20. Defendant Cathey Carter was the New Orleans Police Department detective who led the investigation into Brown. *See id.* at ¶ 200. Based on Carter's investigation, the District Attorney's office prosecuted and convicted Brown, and he spent the next thirty years in prison for a crime he did not commit.

Brown's innocence was well-known, given that the victim's cousin had confessed to the rape publicly and in graphic terms in front of multiple witnesses. R. Doc. 20 at ¶¶ 121-125. Despite this man's confession, Detective Carter testified that she "never had any [other] suspects" besides Brown. *Id.* at ¶ 134. Detective Carter went beyond simply ignoring the actual perpetrator; she participated in fabricating false evidence against Brown — specifically, a letter purportedly from the victim to Brown that said "you raped me." *Id.* at ¶ 189. But the victim never wrote that letter; it was a fake. *Id.* at ¶ 193. Accordingly, Brown has sued Detective Carter for three things:

    i. The use of improper and suggestive identification procedures;

    ii. Fabricating evidence such as the handwriting that Brown "raped me"; and

    iii. Failing to disclose *Brady/Giglio* or otherwise favorable material.

As discussed herein, the motion should be denied.

1

**LAW AND ARUGMENT**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff need only plead enough facts—accepted as true—to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Nevarez v. Coleman*, No. 21-1855, 2023 WL 372088, at *3 (E.D. La. Jan. 24, 2023) (Vance, J.) (quoting *Iqbal*, 556 U.S. at 678). "The Court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239, 244 (5th Cir. 2009)).

A. **Carter's motion should be denied on the *Brady* claim because she falsely assumes that the "prosecution possessed or knew about all of the *Brady* material that Ms. Carter allegedly withheld."**

As Carter concedes, *Brady v. Maryland* obligations are not limited only to prosecutors. A criminal defendant is entitled to disclosure of favorable material even if the material is "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). As a result, a police officer can be liable for a *Brady* violation. *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992) (a police officer's "deliberate failure to disclose . . . patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983"); *Geter v. Fortenberry,* 849 F.2d 1550, 1559 (5th Cir. 1988) ("a police officer cannot avail himself of a qualified defense if he . . . deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles.").

Carter does not argue that this law was insufficiently clearly established in 1994. Nor could she; the Fifth Circuit held as early as 1967 that concealments of "exculpatory evidence by police officers were constitutional violations." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 480 n.11

2

(5th Cir. 1999) (citing *Luna v. Beto*, 391 F.2d 329, 332 (5th Cir. 1967). Instead, Carter's argument consists of two premises: (1) for her to be liable, she must have withheld favorable evidence from the prosecutors, and (2) that "Plaintiff's Amended Complaint clearly alleges that the prosecution possessed or knew about all of the *Brady* material that Ms. Carter allegedly withheld." R. Doc. 32-1 at 6.

At least one section of this Court has rejected Carter's first premise, holding that "it was clearly established that a police officer violates clearly established constitutional rights when he conceals exculpatory evidence, including when he fails to disclose such evidence to the prosecuting attorney's office." *Williams v. Connick*, 2014 U.S. Dist. LEXIS 5187, 2014 WL 172520, at *35 (E.D. La., Jan. 15, 2014) (Feldman, J.). And in *Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008),[1] the Fifth Circuit held that "a police officer's deliberate concealment of exculpatory evidence violates [the *Brady*] right, and can give rise to liability under § 1983"—without discussing whether that evidence was concealed from prosecutors. Thus, the law suggests that a police officer may incur *Brady* liability in circumstances *including but not limited to* when the officer withholds evidence from prosecutors.

Beyond that, Carter's second premise is wrong. The complaint alleges that prosecutors had *some* of the *Brady* material, but it does not allege that they had *all* of it. One of the key pieces of *Brady* material is that NOPD officers fabricated the "letter that supposedly was from L.B. to Brown, falsely stating that L.B. said that Brown put his 'petnuts' in her and 'raped' her." R. Doc. 20 at ¶ 198. There is no indication anywhere in the complaint that Carter provided that fact to the prosecution. Because the factual premise of Carter's motion—that the complaint alleges that the prosecution had all the *Brady* material— is wrong, Carter's motion should be denied.

---

[1] The full name of the plaintiff in *Brown* was Dennis Patrick Brown. It is a reminder of how endemic *Brady* are in Louisiana that there can be a jurisprudence of *Brady* violations only against men named "Patrick Brown."

3

**B.     Carter's motion should be denied on the fabrication-of-evidence claim because the Fifth Circuit has rejected that fabricated evidence must be used at trial to be actionable.**

Brown's complaint alleges that Detective Carter fabricated or participated in fabricating false evidence: a letter purportedly from the victim to Patrick Brown, saying that Brown put his "petnuts" in her and raped her. R. Doc. 20 at ¶¶ 189-198.[2]

The letter is a known fabrication because the victim did not write it, and the words in it are not hers. *See id.* at ¶¶ 193-197. Indeed, she did not even know the word "rape" at the time." *Id.* at ¶ 197.

Carter argues, however, that fabricating this letter does not state a claim because it was not "presented to the trier of fact during Plaintiff's criminal trial." R. Doc. 32-1 at 7. But Carter does not cite any case that stands for the proposition that "presentment to the trier of fact" is a necessary element of a fabrication claim. In fact, Carter cites *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021), which says only that "a plaintiff must assert a causal connection between the fabrication of evidence and the deprivation of liberty,"—a standard met here.

The Fifth Circuit has made clear that it is *not* necessary for evidence to be used at trial for a plaintiff to assert a plausible fabrication-of-evidence claim. *Cole v. Carson*, 802 F.3d 752, 771-772 (5th Cir. 2015) ("*Cole I*"), *cert. granted, judgment vacated sub nom. Hunter v. Cole*, 137 S. Ct. 497, 196 L. Ed. 2d 397 (2016) *and opinion reinstated in part*, 935 F.3d 444 (5th Cir. 2018) (en banc). In *Cole I,* the Fifth Circuit held that "[w]e agree with those [circuits] that have found a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person . . . We agree with the Second Circuit that official framing of a person in

---

[2] "Petnuts" is presumably a word that the officers imagined a child would use instead of "penis." It was not, however, a word the victim used when she was a child. R. Doc. 20 at ¶ 194. The officers implausibly thought a six-year-old child would use the phrase "raped me," but not know how to say "penis." *Id.* at ¶ 189.

4

these circumstances undermines the right to a fair trial." *Id.* In doing so, the Fifth Circuit followed a Second Circuit's case that "denied qualified immunity for the fabrication despite the fact that the charges were dismissed without trial." *Cole I* at 768 (citing *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 126-27, 129 (2d Cir.1997)).[3] "Use at trial" cannot possibly be a necessary element of a claim if the claim can survive in the absence of any trial at all.

Here, the Complaint alleges that Carter used fabricated evidence to frame Brown for a crime he did not commit. See R. Doc. 20 at ¶ 198 ("Thus, NOPD Defendants fabricated a letter that supposedly was from L.B. to Brown, falsely stating that L.B. said that Brown put his 'petnuts' in her and 'raped' her."); ¶ 99 ("Police arrested Brown that day for aggravated rape"). And there is certainly a plausible causal connection between the fabrication of evidence and the deprivation of liberty, given that if Carter's fabrication had been known, the charges against Brown would likely have been dropped or he would have been released on bond. *See* R. Doc. 20 at ¶ 281 (alleging that it was foreseeable that as a result of Carter's actions, "Brown would be wrongfully detained and incarcerated, and in fact, Brown was wrongfully detained and incarcerated and served almost thirty years for a crime he did not commit").

Because Defendant's motion is premised on a legal proposition that is incorrect, the motion should be denied.

**C.     Carter's motion that she is absolutely immune from liability for her testimony at trial should be denied as moot, because Brown brings no such claim.**

Carter next argues that "Plaintiff cannot state a claim for relief against Ms. Carter based upon any of Carter's testimony at Plaintiff's criminal trial." R. Doc. 32-1. Carter does not explain why she thinks there is such a claim in this case. There is not one, and so this aspect of Defendant's

---

[3] These principles have been long established in the Fifth Circuit. *See Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) ("We agree with Geter that a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles." (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977); *Brady v. Maryland*, 373 U.S. 83 (1963))).

5

motion can be denied as moot.

D.     **Carter's motion should be denied as to negligence because both of Carter's arguments are contrary to the complaint's allegations.**

Carter next argues that Brown fails to state a negligence claim. She argues without citation that "Plaintiff admits that prosecutors were in possession of all of the allegedly exculpatory information known to Ms. Carter," R. Doc. 32-1 at 9, which as explained above, is simply incorrect.

Carter argues also that there is no negligence claim because "Plaintiff has failed to allege that any purportedly suggestive identification process or other 'fabrication' of evidence caused Plaintiff to be wrongfully convicted." *Id.* But again, as explained above, if it had been known that the police fabricated a letter in the victim's voice falsely accusing Brown of the rape, it is hard to see how the prosecution would have been successful, or even continued past that point.[4] Drawing all reasonable inferences in Brown's favor, the complaint alleges a facially plausible negligence claim.

E.     **Carter's motion should be denied because the doctrine of qualified immunity is contrary to the Notwithstanding Clause of the original text of Section 1983.**

Carter's motion should also be denied because Section 1983's statutory text does not support the doctrine of qualified immunity. The original text of Section 1983 contained a "notwithstanding clause" that was later omitted in what became our modern U.S. Code.[5] But the

---

[4] *Cf. Witness fabricated evidence against teacher and principal accused of child abuse, officials say,* Bradenton Herald (July 27, 2020) (all charges "dropped by the State Attorney after investigators found that the witness had fabricated evidence."); *Charges dropped against former Wash. cop falsely accused of assault*, Police1 (Oct. 10, 2018) (all charges dropped after "a six-month investigation revealed his accuser fabricated evidence"); *Child abuse charges dropped against Hillsborough County teacher, principal*, Bay News 9 (Jan. 8, 2018) ("Charges of child abuse against a Tampa school principal and teacher have been dropped because of fabricated evidence, according to the State Attorney.").

[5] This section relies substantially on the recent scholarship of Professor Alexander A. Reinert, as reflected in his forthcoming article *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 166-67. This section also relies on the research and briefing of the Institute for Justice, as reflected in its amicus brief in *Health and Hospital Corporation of Marion County v. Talevski,* 142 S. Ct. 2673 (2022). That amicus brief is available online here: https://tinyurl.com/3kjhd434

omitted clause still has the force of law and it directly contradicts the assumption that grounds the doctrines of qualified immunity. Thus, these doctrines are premised on the *absence* of text that we now know was actually *present*. As the Fifth Circuit's Judge Willett explains, the qualified-immunity doctrine is "flawed — foundationally—from its inception." *Rogers v. Jarrett*, 63 F. 4th 971, 979 (5th Cir. 2023) (Willett, J., concurring).

1. <u>The original version of Section 1983 contained a "Notwithstanding Clause" that does not appear in today's U.S. Code.</u>

When Congress passes new legislation, it "does not write [] on a clean slate." *United States v. Texas*, 507 U.S. 529, 534 (1993). It legislates against a backdrop of established "common law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Congress can either retain the common law's "long-established and familiar principles" or reject them. *Texas*, 507 U.S. at 534. Courts assume that Congress retains the common law unless the statutory text says otherwise. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35–36 (1983).

Since 1967, the Supreme Court has assumed that Congress intended to retain common-law principles in Section 1983. In *Pierson v. Ray,* the Supreme Court concluded that the "legislative record [of Section 1983] gives no clear indication that Congress meant to abolish wholesale all common-law immunities," so the Court granted defendants a "defense of good faith and probable cause" that existed in Mississippi's common law. 386 U.S. 547, 554, 557 (1967). This assumed-to-be-incorporated "good faith" defense evolved into the modern doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806-807 (1982) ("As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.").[6] And with each step along the path of qualified

---

[6] More recent scholarship casts doubt on whether any generally available defense of good faith for constitutional claims or common law torts existed in 1871. *See* Baude, *Is Qualified Immunity Unlawful?*,

7

immunity, the Supreme Court has explicitly relied on the supposed silence of Section 1983 to support the doctrine.[7]

But the Supreme Court was wrong to assume that Congress intended to incorporate common law immunities in Section 1983 because the version of Section 1983 that the Court looked at in *Pierson* – the U.S. Code – *omits* language that Congress originally passed.

The 42nd Congress passed Section 1983 as part of the Ku Klux Klan Act of 1871, and the original statutory text was reflected in the Statutes at Large and is longer than its contemporary U.S. Code counterpart. The U.S. Code version has just two relevant clauses:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall
>
> . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]

Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871).

The original statute, however, had three—containing "additional significant text" where the ellipsis appears above. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*,

---

106 Cal. L. Rev. 45, 55-57 (2018); Schwartz, Joanna C., *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1801-1802 & nn.24- 26 (2018). And there is growing cross-ideological criticism of the doctrine. *See, e.g., Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring in part and concurring in the judgment) (noting his "growing concern with our qualified immunity jurisprudence."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (criticizing the Court's "one-sided approach to qualified immunity [which] transforms the doctrine into an absolute shield for law enforcement.").

[7] *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions."); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) ("Although the Court has recognized that in enacting §1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials."); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) ("The decision in *Tenney* established that §1983 is to be read in harmony with general principles of tort immunities and defenses, rather than in derogation of them."). For a more thorough treatment of the evolution of the doctrine of qualified immunity, *see* Reinert, *supra*, at 115 et seq.

8

111 Calif. L. Rev. 101, 166-67 (forthcoming).

The additional clause said that government officials "shall, <u>any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding</u>, be liable" for constitutional violations. Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added).[8]

Two key phrases—first, "custom[ ] or usage of the State" and second, "to the contrary notwithstanding" are essential to understanding the "Notwithstanding Clause."

The 42nd Congress understood "usage or custom" to be the common law itself. *Strother v. Lucas*, 37 U.S. 410, 437 (1838). Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means a right by common law." *Id.*[9] The original text also said that officials will be liable for constitutional violations "notwithstanding" any "contrary" common-law principles. The ordinary public meaning of "notwithstanding" is the same today as it was in 1871: "notwithstanding" means "[w]ithout opposition, prevention, or obstruction from," or "in spite of." Complete Dictionary of the English Language 894 (Webster's 1886); *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or "without prevention or obstruction from or by"); *see generally Bryan A. Garner,*

---

[8] That language can be seen highlighted in an authentic copy of the Civil Rights Act of 1871, certified by the National Archives and Records Administration on August 19, 2022, found at R. Doc. 33-1.

[9] *See also Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law . . . in each [state]."); *Western Union Telegraph Co. v. Call Pub. Co.,* 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs").

The legislative history of Section 1983 confirms this common understanding of "custom and usage" from 1871. For example, "Senator Thurman, speaking in opposition to Section 1 of the 1871 Act (what is now Section 1983), clearly understood that 'custom or usage' was equivalent to 'common law.'" *Reinert*, 111 Calif. L. Rev. at 167. In fact, while expressing his concern over "how comprehensive [the statute's] language is," Senator Thurman was alarmed that an official could be liable for any "deprivation under color of law," which, in his words, included any "'custom or usage' which has become common law." Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871) (available online at https://tinyurl.com/yud52f7d). So Senator Thurman, understood that when the 42nd Congress used the phrase "custom[ ] or usage of the State," it meant the common law of each state.

*Garner's Modern English Usage* 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day.").[10] This plain-English understanding of the "Notwithstanding Clause" is consistent with the context. As Reinert observes, some "the very same people who served in the rebel army were also serving as judges in southern states. It would have been passing strange, then, for the very same Congress to permit liability under Section 1983 to be limited by judge-made law created by state court judges." *Reinert*, 111 Calif. L. Rev. at 175.

In short, the Notwithstanding Clause means that the common law does *not* prevent persons from Section 1983 liability. *Id.* at 167–68 ("Its implications are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983."). As Judge Willett puts it, the "language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations. Rights-violating state actors are liable—period—*notwithstanding* any state law to the contrary." *Rogers,* 63 F.4th at 971 (Willet, J., concurring); *see also Erie v. Hunter*, 21-cv-267-BAJ-RLB at fn. 2 (M.D. La. May 31, 2023) (Notwithstanding Clause shows that "qualified immunity's doctrinal underpinning—that 'no evidence' suggests that the Reconstruction Congress meant to abrogate common law immunities when it fashioned 42 U.S.C. § 1983—is a *fiction*"); *Green v. Thomas*, 23-cv-00126, R. Doc. 34 (S.D. Miss., May 20, 2024) ("If this is true, we've all been applying the wrong version of the statute.")

2. <u>Removing the Notwithstanding Clause in the Revised Statutes of 1874 did not change the law's substance.</u>

In determining what a law says, the current edition of the United States Code is "prima facie" evidence of the law's text. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 448 (1993) (citing 1 U. S. C. § 204(a)). But the original Statutes at Large provides the

---

[10] Many contemporaneous dictionaries confirm this meaning. *See, e.g., Etymological Dictionary of the English Language* 344 (Chambers's 1874) ("not standing against or opposing; nevertheless."); 2 A New Dictionary of the English Language 1351 (1837) ("Not opposing, resisting, hindering, preventing.").

10

actual "legal evidence of laws." *Id.*(quoting 1 U. S. C. § 112); *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("[T]he Code cannot prevail over the Statutes at Large when the two are inconsistent." (quoting *Stephan v. United States*, 319 U.S. 423, 426 (1943)).

Relevant here, shortly after passing the Ku Klux Klan Act of 1871, the 43rd Congress compiled the Revised Statutes of 1874 an effort "to revise, simplify, arrange, and consolidate all statutes of the United States." Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library J. 213, 218 (2020) (cleaned up).

But after years of trying with unsatisfactory results, Congress tasked Thomas Jefferson Durant (a D.C. lawyer not involved in the initial drafting) to strike out any provision that substantively changed the law, but to keep "mere changes of phraseology not affecting the meaning of the law." 2 Cong. Rec. 646, 648 (1874); Ralph H. Dwan & Ernest R. Feidler, *The Federal Statutes—Their History and Use*, 22 Minn. L. Rev. 1008, 1013 (1938). Congress intended "to preserve absolute identity of meaning" in the law, so any change, "however minute," was simply meant to miniaturize and condense the law. 2 Cong. Rec. 4220 (1874); *see also* 2 Cong. Rec. 129 (1873) ("We have not attempted to change the law, in a single word or letter, so as to make a different reading or different sense.").[11] The 43rd Congress passed Durant's revisions as the Revised Statutes in 1874, which later became the U.S. Code.

Because Congress explicitly intended *not* to change the substantive provisions of the law, omitting the Notwithstanding Clause in 1874 did not alter the 42d Congress's original decision to abrogate the common law from Section 1983. *See United States v. Welden*, 377 U.S. 95, 98 fn.4 (1964) (when Congress decides to "revis[e] and consolidat[e] the laws," it does not change the

---

[11] This was true for omissions, too, which the 43rd Congress viewed as a necessary tool "to strike out the obsolete parts and to condense and consolidate." 2 Cong. Rec. 129 (1873). Omissions did not substantively change the law. By statute, the drafters were directed to, and did, provide marginal comments to any substantive edits—yet they left no marginal comments with their edits to Section 1983. *See* U.S. Statutes at Large, Volume 14 (1865-1867), 39th Congress. U.S. Statutes at Large, Volume 14 (1865-1867), 39th Congress.

law's effect unless Congress explicitly says so); *Watt v. Alaska*, 451 U.S. 259, 266–67 (1981) (explaining that when Congress wants to repeal or change a statute, it must do so with "clear and manifest" intent).[12] It makes sense, then, that the U.S. Supreme Court has already viewed the omission of two other Notwithstanding Clauses from other civil rights statutes as non-substantive changes. For example, In *Jones v. Alfred H. Mayer Co.*, the Supreme Court viewed the omission of another Notwithstanding Clause (in Section 1982) as a non-substantive change. 392 U.S. 409, 422 n.29 (1968). The Court recognized that the Notwithstanding Clause was "obviously inserted" to "emphasiz[e] the supremacy of the 1866 statute over inconsistent state or local laws." *Id*. And later, when "[i]t was deleted" in the Revised Statutes, the Court presumed the omission was only to remove perceived "surplusage." *Id*.; *see also The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883).

So too with Section 1983. The 1871 Congress was explicit in legislating that persons can be liable for Section 1983 violations in spite of any contrary common law doctrines. Omitting that language in 1874 did not change the law. Qualified immunity rests on the presumption that the 1871 statute was silent about the common law. But the statute was *not* silent—it explicitly rejected any common law defenses. Judge Willett explains that "the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*." *Rogers*, 63 F.4th at 980. He sums this up as "game-changing arguments, particularly in this text-centric judicial era when jurists profess unswerving fidelity to the words Congress chose. . . the doctrine does not merely *complement* the text—it brazenly *contradicts* it." *Id*. at 980-981.

"Only the written word is the law." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020).

---

[12] In other words, to incorporate the common law back into Section 1983, the Revised Statues would have needed to include some form of positive text about the common law. *See* Reinert, 111 Calif. L. Rev. at 169–71 (explaining that the Notwithstanding Clause's removal was "not the product of any positive lawmaking").

12

And "[f]idelity to text will sometimes require overturning atextual precedent." *Hamilton v. Dallas County,* 21-10133 (5th Cir. 2023, *en banc*) (Ho, J., concurring). Because the original statutory text of Section 1983 shows that the presumption underlying qualified immunity is wrong, this Court should deny those immunities, as Congress intended.

## CONCLUSION

Fort the reasons herein, Defendant Carter's motion should be denied.

Respectfully submitted,

/s/ *William Most*
Caroline Gabriel, La. Bar No. 38224
William Most, La. Bar No. 36914
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
T: (504) 509-5023
williammost@gmail.com

and

Chloé M. Chetta, 37070
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.
909 Poydras St., Suite 2350
New Orleans, Louisiana  70112
Telephone:  (504) 589-9700
cchetta@barrassousdin.com