# United States Court of Appeals for the Fifth Circuit

———————

No. 23-30711

———————

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2024

Lyle W. Cayce
Clerk

BILAL HANKINS,

*Plaintiff—Appellant,*

*versus*

KEVIN WHEELER, *in his individual and official capacity*; RAMON PIERRE, *in his individual and official capacity*; CARL PERILLOUX, *in his individual and official capacity*; HOUSING AUTHORITY OF NEW ORLEANS; HURTSVILLE SECURITY AND NEIGHBORHOOD IMPROVEMENT DISTRICT; DOE INSURANCE COMPANIES 1-10; KERRY NAJOLIA; SOUTHEAST LOUISIANA FLOOD PROTECTION AUTHORITY - EAST; MICHAEL BRENCKLE; DARNELL LAURENT; THADDEUS PETIT; JAMEL BROWN; TYRONE MARTIN; DEMETRUIS JACKSON; TOMMY MERCADAL; LEONTINE MULLINS,

*Defendants—Appellees.*

———————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1129

———————————————

Before HIGGINBOTHAM, STEWART, and HIGGINSON, *Circuit Judges.*
STEPHEN A. HIGGINSON, *Circuit Judge*:

Bilal Hankins alleges that he was a passenger in a car with two other youths driving slowly at night looking for a neighbor's lost dog when he asked

No. 23-30711

defendant Officer Kevin Wheeler, on patrol for a local private security district, for assistance in finding the dog. Hankins contends that Officer Wheeler and another officer, Officer Pierre, later stopped the car he was in without reasonable suspicion and exercised excessive, unlawful force when they approached the car with guns drawn. Hankins brought unreasonable seizure, excessive force, constitutional conspiracy, supervisory liability, and *Monell* claims under Sections 1983, in addition to related state-law claims.

After limiting discovery to the issue of qualified immunity, the district court concluded that there was no question of material fact as to whether there was an underlying constitutional violation of either Hankins' right to be free from an unlawful seizure or his right to be free from excessive, unlawful force. The district court granted summary judgment to defendants on all federal claims because each federal claim relied on an underlying constitutional violation.

Because questions of material fact preclude summary judgment on the seizure claim, we REVERSE the summary judgment on that claim, VACATE the summary judgment on the other federal claims, and REMAND for further proceedings.

I

On the evening of June 13, 2020, Hankins was socializing with friends and neighbors at his family's home in Uptown New Orleans, where he helped his mother care for his grandmother. Hankins had invited over his friend who was visiting from college. With them were Hankins' neighbor and her twelve-year-old nephew. At some point, they realized that the neighbor's chihuahua had escaped. At approximately 11:30 PM, the three youths went to look for the dog, with the college student driving the BMW that his mother gave him for his high school graduation. The twelve-year-old sat in the front

passenger seat and Hankins sat in the back. The residential street had many potholes, and they drove slowly while looking for the chihuahua.

They drove up to Officer Wheeler, who was on a private security detail for the Hurstville Security and Neighborhood Improvement District, in his marked, Orleans Levee District Police Department car and asked for help finding the lost dog. Officer Wheeler testified that he had observed three people "hanging out" of the car's windows, which was directly contradicted by Hankins' testimony that no one was leaning out of the car's windows. The parties agree that Hankins engaged Officer Wheeler first to ask if he had seen a lost dog. Officer Wheeler responded that he had not seen a lost dog, and the parties agree that Hankins replied that they were looking for one and asked for help finding it. Hankins testified that he then gave Officer Wheeler his address, pointed in the direction of his house two blocks away, and described the dog as a small, white chihuahua with brown spots. Officer Wheeler disputes that Hankins provided his address and testified that Hankins instead said, "if you see it, call us."

The car that Hankins was in continued to drive on slowly. Officer Wheeler testified that he ran the car's plates. He found that it was *not* reported stolen. It was registered to a woman at an address in a different neighborhood of the city, New Orleans East. He then radioed Officer Ramon Pierre, an off-duty officer for the Housing Authority of New Orleans Police Department who was working the same private security patrol in his unmarked, personal car. Officer Wheeler testified that he relayed "what [he] saw," the exchange about the lost dog, and that the car was registered to an address in New Orleans East. Officer Wheeler testified that they decided to conduct a stop after Officer Pierre "said something's not right." Officer Wheeler did not follow the car. Officer Pierre then came across the car and started driving at a distance behind it.

Officer Wheeler came upon the car again and testified that both he and Officer Pierre then flashed their lights and the car briefly continued to drive slowly before stopping when Officer Wheeler activated a siren tone. Hankins, though, testified that he was unsure whether any lights or sirens were activated. Hankins testified that Officer Wheeler announced over an intercom, "[d]river, get the f--- out the car," and Officer Pierre emerged from an unmarked car with "his gun drawn, raised above his shoulders," and "pointed" "directly through the car[.]" Hankins testified that he then showed his hands "[b]ecause his mom taught [him] at a young age to comply with police officers and especially given the fact that [he is] a young, African-American male." Officer Wheeler testified that he did not shout profanities and only pointed a flashlight. Officer Wheeler testified that, though unable to see Officer Pierre's right side, Officer Pierre also did not have his gun drawn because Officer Wheeler did not see him extend his arm or hear him draw his gun.

There was an exchange about where the car's occupants lived, the officers checked the driver's ID, and the group was allowed to leave, though there is some dispute about what Officer Wheeler said when doing so. Officer Wheeler testified that he apologized, said that "[i]t just didn't add up," explained there had been car burglaries with people "leaning out pulling on car door handles," and told the group to "[h]ave a great day." Hankins testified that, as the group was leaving, Officer Wheeler instead said "you know, three young men, in a nice car, in this neighborhood," but mentioned no other reasons for stopping the youths.

## II

Hankins filed citizen complaints with the various law enforcement entities involved, stating that he "no longer fe[lt] protected" because this incident occurred "when [he] tr[ied] to ask police for assistance." He later

explained that "[a]s a young Black male who was just eighteen years old," that this occurred "after [he] had asked [Officer Wheeler] for help has had a lasting impact on [his] sense of self and self-worth." He eventually filed this lawsuit.

Hankins sued Officers Wheeler and Pierre in their individual capacities under Section 1983 for unreasonable seizure and excessive force in violation of the Fourth and Fourteenth Amendments and under Section 1983 and Section 1985 for conspiracy to deprive him of the same. He sued various law enforcement entities and officials under Section 1983, arguing that they were liable for the unreasonable seizure and excessive force under a theory of *Monell* liability. He also brought state-law claims for negligent hiring/supervision. Finally, Hankins brought state-law claims for aggravated assault, assault, intentional infliction of emotional distress, and negligent infliction of emotional distress against Officers Wheeler and Pierre. Discovery was then limited to the issue of qualified immunity.

Defendants moved for summary judgment on qualified immunity. We discuss the district court's reasoning in greater depth below. On the seizure claim, it concluded that there was no constitutional violation because there was no question of material fact as to whether there was reasonable suspicion for the stop. On the excessive force claim, it concluded that there was no constitutional violation because there was no question of material fact as to whether the use of force was objectively reasonable. The district court therefore did not consider whether, on either claim, any violation would have been of clearly established law. It also granted summary judgment on Hankins' constitutional conspiracy, supervisory liability, and *Monell* claims because each required an underlying constitutional violation. It declined supplemental jurisdiction over the state-law claims and dismissed those without prejudice. This timely appeal followed.

III

A summary judgment is reviewed *de novo*. *Nickell v. Beau View of Biloxi, LLC*, 636 F.3d 752, 754 (5th Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[W]here the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence," which "shift[s] to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994). "The nonmovant cannot satisfy this burden merely by denying the allegations in the opponent's pleadings but can do so by tendering depositions, affidavits, and other competent evidence to buttress its claim." *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992). "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity inquiry has two prongs, which we take in either order. *Id.* at 236. "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right [.]'" *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly

established' at the time of the violation." *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Hankins "has the burden to point out the clearly established law." *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019).

Hankins argues that qualified immunity should be unavailable as a defense to a Section 1983 action or, at a minimum, should not bar full discovery. He points to the recent revelation that Section 1983 as originally enacted contained a "Notwithstanding Clause" that appears to abrogate common-law immunities. *See* Alexander Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 207–08 (2023). As Judge Willett has explained, "[t]he Reviser of Federal Statutes made an unauthorized alteration to [that] language," which "was compounded when the various revised statutes were later published in the first United States Code" and "has never been corrected." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring). Whatever its merit, the argument is foreclosed because "[o]nly th[e] [Supreme] Court can definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence," *id.* at 981, and the Court has not done so.

## IV

We now consider Hankins' unlawful seizure claim, first addressing the violation and then the clearly established law. We next explain why our conclusion on this claim requires vacating the summary judgment on the remaining federal claims, including the excessive force claim, and remanding for further consideration in light of our holding.

A

"Warrantless searches and seizures are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (internal quotation marks and citation omitted). One such exception is that "police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion requires "more than an inchoate and unparticularized suspicion or hunch." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (internal quotation marks and citation omitted). Instead, the officer must "point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime." *Hill*, 752 F.3d at 1033 (internal quotation marks and citation omitted). The inquiry turns on the "totality of the circumstances." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

Defendants concede the stop was a seizure. They do not argue that there was any traffic violation or other infraction to separately justify the stop. The only question, then, is whether there was reasonable suspicion of criminal activity. We hold that material fact disputes preclude answering this question at summary judgment.

The district court concluded that there was no genuine question of material fact as to whether there was reasonable suspicion of criminal activity for the stop. First, it stated that there was a "history of vehicle break-ins in the neighborhood," Officer Wheeler had "personal experience seeing car burglars drive slowly along residential streets and hang out of car windows pulling on door handles of parked cars," and Officer Wheeler testified that he observed the car's occupants leaning out of the windows though not

pulling on handles or otherwise doing anything to parked cars. Second, the officers knew the car was registered in a woman's name to an address in New Orleans East, though the officers confirmed that it was not reported stolen. Third, it was late at night. The district court concluded that these three factors, when taken together, rose to the level of reasonable suspicion. It acknowledged two factors that undermined this conclusion but provided no further explanation beyond that acknowledgment: It noted the parties' agreement that Hankins asked Officer Wheeler for help but stated that this "does not alter the other facts with which Officers Wheeler and Pierre were confronted when they chose to conduct the stop," and, in its recitation of the facts, Hankins' testimony that Officer Wheeler said, "you know, three young men, in a nice car, in this neighborhood."

We now address the factors that the district court relied on, mindful that our reasonable suspicion inquiry requires considering each in light of the "totality of the circumstances." *Garner*, 471 U.S. at 9 (1985).

The district court repeated the assertion made by defendants in their summary judgment motions that there was a "history of vehicle break-ins in the neighborhood." The only record evidence cited by defendants in their summary judgment motions that supports this assertion is Officer Wheeler's testimony that he told Hankins "what happens in the area, how we have encountered people driving down the street in a car leaning out pulling on car door handles, stopping, burglarizing the car, getting in and driving down the street."[1] Setting aside that Hankins testified that Officer Wheeler never said this, we consider the broad assertion that there had been car burglaries, at

---

[1] The other record evidence that defendants cited at summary judgment has no bearing on whether there had been car burglaries in the area. That evidence was Officer Wheeler's disputed testimony that the occupants of the car were leaning out the windows, which does not go to whether there had been car burglaries in the area.

some unspecified point in time and at an unknown time of day, in "the area," though how broadly defined that area is we do not know.

Even in cases where—unlike this one—there is a description of recent criminal activity in a specific location, we have required a particular connection between the crime suspected in the area and the individual stopped. In *United States v. Jaquez*, for example, we held that an officer did not have reasonable suspicion to stop a red vehicle driving away from "the area of the [intersection of] 10th and Pine Streets," a "high crime area," despite receiving a dispatch that "gun shots had been fired in the area of 10th and Pine Streets" and that a "'red vehicle' was involved in the incident." 421 F.3d 338, 341–42 (5th Cir. 2005). So too in *United States v. McKinney*, 980 F.3d 485 (5th Cir. 2020). There, we explained officers patrolling a stretch of sidewalk "within seconds" of a business that "in recent days had been the location of multiple gang-related shootings" did not have reasonable suspicion to stop a group on the sidewalk after a member of the group started to walk away when the officers approached because the officers lacked an "articulable suspicion about a connection between the person and those crimes." *Id.* at 492. This was so even though an individual was wearing colors affiliated with a particular gang and a jacket despite it being "quite warm and humid out" and another "turned and appeared to drop something very small." *Id.* at 490 (internal quotation marks omitted).

Here, whether there was the requisite connection between the crime suspected in the area—burglarizing parked cars—and Hankins turns on a dispute of material fact. To establish the particularized suspicion linking the purported history of car burglaries in "the area" and the occupants of the car that Hankins was in, the district court relied on Officer Wheeler's testimony that the car's occupants were leaning out of the windows. But the district court did not address the fact that Hankins testified that the car's occupants were not leaning out of its windows, which Hankins testified that he would

No. 23-30711

have known because the car had a very sensitive seatbelt indicator that did not go off at that time.[2]  Because "[a]ny credibility determination made between [Officer Wheeler's] and [Hankins'] version of events is inappropriate for summary judgment," *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005), we may not consider this testimony that the district court relied on from Officer Wheeler.

We next ask whether the remaining evidence that we may rely on at summary judgment, when considered in its totality, amounts to "more than an inchoate and unparticularized suspicion or hunch." *Wardlow*, 528 U.S. at 123–24 (internal quotation marks and citation omitted).  We are left with: A college-aged male in a car registered to a woman's name in a different neighborhood of the same city, driving slowly on a residential street at night after approaching an officer to ask for assistance finding a lost chihuahua. Taken together and mindful that we must construe all disputed facts in Hankins' favor, we cannot say that these are "specific and articulable facts which, taken together with rational inferences from those facts," allow us to decide there was reasonable suspicion.  *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009) (citation omitted).

The vehicle registration information, taken together with those other factors, does not rise to the level of reasonable suspicion.  In our reasonable suspicion analysis, we must consider "rational inferences from . . . facts" that the officers point us to.  *Id.*  From these facts, they do not argue that they had particularized suspicion that the car they stopped had been stolen. Importantly, they were able to check before the stop to confirm that the car was not reported as stolen.  They instead argue that these facts support the

---

[2] The officers testified that none of the car's occupants tried to open car doors or otherwise touched other cars.

inference that the occupants of the car might be attempting to burglarize cars in this neighborhood, but they point to no caselaw in which any court has concluded that this vehicle registration information can contribute to finding reasonable suspicion nor do they offer any explanation otherwise for why this inference could be drawn. In unpublished authority, we have explained that "an out-of-state driver's license and license plates" may not, when considered alongside other factors, "suffice to create reasonable suspicion of criminal activity." *United States v. Davis*, 620 F. App'x 295, 298 (5th Cir. 2015). So too with "use of another's vehicle," *id.*, as people living in the same household drive one another's cars, whether that of a spouse or a parent. And we think this observation about the limited inferential value of a car driving in a different *state* applies at least equally to a car driving in a different *neighborhood*. Mindful that, "[a]ny analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion," *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999), we cannot consider the registration information in isolation from the fact that it was 11:30 PM and the car was driving slowly down a residential street with potholes. But here, where officers cannot articulate a connection between the registration information of a car not reported as stolen and the suspected criminal activity of attempting to burglarize parked cars, we conclude that this factor counts for little in our analysis of the totality of the circumstances.

Next, Hankins agrees that the car that he was in was driving slowly on this residential street, and he testified that this street was one on which "cars do drive slow[ly] . . . given all the potholes," which defendants do not dispute. Defendants point to no caselaw in which driving slowly, let alone driving slowly on a residential street, was a factor supporting reasonable

suspicion.[3]  We may, of course, look to "rational inferences" that were drawn, *Rodriguez*, 564 F.3d at 741, but the officers provide no explanation for why driving slowly on a residential street would support a particularized suspicion that the car's occupants were attempting to burglarize cars.  And that they continued to drive slowly in full view of the police officer they asked for assistance is inconsistent with the inference that their slow driving was part of criminal activity.

Rather than explain how the slow driving supports a particularized suspicion that the car's occupants were attempting to burglarize cars, the officers rely entirely on the disputed testimony that the car's occupants were also leaning out of the car as they drove slowly, which we cannot consider at this stage.  Even setting that aside, the ability to draw a rational inference from the slow driving supporting reasonable suspicion is undermined by the information that the officers concede that they had: Officer Wheeler testified that Hankins approached him before the challenged stop for assistance finding a chihuahua that had just been lost in the neighborhood.  Hankins testified that he gave Officer Wheeler his address, pointed in the direction of his house two blocks away, and described the dog as a small, white chihuahua with brown spots.  Though Officer Wheeler disputes that Hankins provided his address and testified that Hankins instead said, "if you see it, call us," we are required to credit Hankins' description, as nonmovant, of what information he provided, *see Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 238 (5th Cir. 2016).

---

[3] Nor did Officer Wheeler testify that the car decelerated upon encountering his marked police vehicle, distinguishing these facts from those cases in which we have held that decelerating upon "the approach of a patrol car . . . may be one factor contributing to the reasonable suspicion justifying a stop."  *United States v. Villalobos*, 161 F.3d 285, 291 (5th Cir. 1998).  Indeed, as we have discussed, Officer Wheeler testified that the car approached him instead.

Given the little work the factors we have discussed above do in the reasonable suspicion analysis, we turn to the final factor offered by the officers and relied on by the district court—that the stop occurred at approximately 11:30 PM—and ask whether, in combination with those factors, they "in the aggregate rise to the level of reasonable suspicion." *Ibarra-Sanchez*, 199 F.3d at 759. Defendants have never offered any information about when car burglaries in the area occurred, let alone that they occurred at night, but the lateness of the hour may still go to reasonable suspicion if it is in combination with other factors. *See, e.g.*, *United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992) (holding that the lateness of a stop went to reasonable suspicion where an individual backed away from police and moved as if drawing a weapon on a street with frequent drug sales).

*United States v. Hill* is illustrative. There we concluded that there was no reasonable suspicion to stop a man "without a driver's license, at 11:00 p.m. on a Saturday night, in an apartment complex that has a drug reputation and is in a high-crime county, [who] was sitting in the driver's seat of a car that was backed into a parking spot, and, when the police arrived, [the man's] passenger exited from the car and took a few steps away." 752 F.3d at 1034. The passenger's exit was "quick," and the car was "backed into the parking space" which the officers testified is how people sometimes "hide their tags." *Id.* at 1036. That nighttime conduct which could be consistent with a drug sale—sitting in a car without the license required to drive the car, with another person who quickly walked away when police arrived—was insufficient even alongside the fact that the individual who was stopped was in front of an apartment complex in which drug activity frequently occurred. If this conduct and this specific information about crime in the apartment complex in *Hill* did not amount to reasonable suspicion when considered alongside the fact that it was 11 PM, then the conduct observed in the instant

No. 23-30711

case and the description of past car burglaries alongside the fact that it was just half-an-hour later do not rise to reasonable suspicion here.

Furthermore, we concluded in *Hill* that "[r]easonable officers in such circumstances would have very little cause to suspect criminal activity rather than, say, a couple who just arrived home on a weekend night and were preparing to go inside." *Id.* at 1038. Unlike in *Hill*, we do not need to hypothesize about what might explain why Hankins was out at 11:30 PM because Officer Wheeler testified that, minutes before the challenged stop, Hankins approached him for help finding a chihuahua that had just gotten out. And this affirmative explanation offered to Officer Wheeler makes this case clearer than the cases above in which we analyzed the same factors and concluded that those did not amount to reasonable suspicion without an affirmative explanation given to the officers for conduct that might otherwise appear unusual. Officer Wheeler was not required to credit what Hankins said but we may not ignore it in this totality-of-the-circumstances analysis as we consider all of the factors.

Finally, we examine a factor not considered by the district court in its reasonable suspicion analysis: Hankins' testimony that, at the end of the stop, Officer Wheeler said, "you know, three young men, in a nice car, in this neighborhood." Officer Wheeler testified that he did not say this. But in this posture, we must "constru[e] all facts and inferences in the light most favorable to [Hankins as] the nonmoving party." *Naquin*, 817 F.3d at 238. If a factfinder was to credit Hankins' testimony over Officer Wheeler's on this point, a factfinder would be faced with the officer's own, contemporaneous explanation for why the stop occurred directly contradicting the explanation that the officers now offer that the stop was premised on a particularized suspicion that the occupants of the car were attempting to burglarize cars. This fact dispute goes directly to the key question of whether there was "more than an inchoate and unparticularized suspicion or hunch," *Wardlow*,

528 U.S. at 123–24 (internal quotation marks and citation omitted), for the stop and thus, when taken together with the other factors discussed, precludes summary judgment.

## B

Defendants argue that "[i]n the event that this [c]ourt finds a genuine dispute of material fact as to the alleged constitutional violation[], it should exercise its discretion to determine whether the alleged  constitutional right was clearly established at the time of the challenged conduct."  They urge this because, "[e]ven assuming there was a factual issue as to whether any constitutional violation occurred, the [o]fficers are nonetheless entitled to qualified immunity because Hankins cannot show a violation of clearly established law."  We therefore ask whether, given the genuine disputes of material fact that we have identified above, any violation would be of clearly established law.

"[T]he question must be 'frame[d] … with specificity and granularity," *Garcia v. Bevins*, 957 F.3d 596, 600 (5th Cir. 2020) (citation omitted), though there may be "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights," *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope*, 536 U.S. at 740).

We agree with Hankins that his reliance on *Hill* satisfied his burden to point to clearly established law at summary judgment.  As we explained above, we held that officers unconstitutionally seized a man without reasonable suspicion when the only factors that the officers could point to were that he was "without a driver's license, at 11:00 p.m. on a Saturday night, in an apartment complex that has a drug reputation and is in a high-crime county," *Hill*, 752 F.3d at 1034, the car was "backed into the parking

No. 23-30711

space" which the officers testified is how people sometimes "hide their tags," *id.* at 1036, and the exiting passenger left "quick[ly]" when police arrived, *id.* Defendants, in attempting to distinguish *Hill*, ignore that *Hill* also occurred "late at night" (separated by perhaps thirty minutes) and the *Hill* officers' testimony that the fact that the car was backed into its parking space suggested that the car's driver may be attempting to obscure identifying information. Defendants also mistakenly describe *Hill* as involving only an "elevated incidence of crime spann[ing] an entire county, not a single neighborhood, as in the instant matter," when the officers in *Hill* described the "apartment complex" itself, and not merely the county, as "a 'hotspot' for crime," *Hill*, 752 F.3d at 1031; *see also id.* at 1034 (describing location as "an apartment complex that has a drug reputation"). The facts before us on the issue of recent criminal activity are, as we have described above, much farther from reasonable suspicion than the description offered by the officers in *Hill*. So too of the more incriminating conduct in *Hill*. Officers Wheeler and Pierre were thus on notice that these facts did not amount to a particularized suspicion of criminal activity permitting a stop.

Hankins also points to *Alexander v. City of Round Rock*, 854 F.3d 298 (5th Cir. 2017). In that case, we concluded that "the lack of reasonable suspicion was clearly established" where "the factors we laid out as relevant in," among other  cases, *Hill* and "the Supreme Court's decision in *Wardlow*" did "not support reasonable suspicion." *Id.* at 305. A police officer observed a man get out of his car and look around the grass near a parking lot at 9:15 PM and, then, seemingly upon spotting the officer, the man got back into his car and started to drive away from the officer. *Id.* at 301. We underscored that we were "not suggest[ing] that the officers in this circuit ha[d] faced this precise situation before," which "is not a condition precedent to denying qualified immunity [because] 'officials can still be on notice that their conduct violates established law even in novel factual

No. 23-30711

circumstances.'" *Id.* (quoting *Hope*, 536 U.S. at 741). Instead, we looked to the relevant factors from the cases we identified. In concluding that the law was clearly established that there was no reasonable suspicion, we emphasized the absence of "[n]ervous, evasive behavior," *id.* at 304, and that, unlike the woman walking quickly away from the parked car in *Hill*, this man did not "actively alter[] h[is] behavior to move away from police officers when they got near," though he did drive away from them, *id.* at 305. We think that these points are especially salient here where Hankins affirmatively approached Officer Wheeler for help, had a conversation with him, and then the car that he was in continued driving slowly as it had been doing before Hankins asked for help.[4]

To distinguish from these cases, defendants, again, chiefly rely on the disputed material fact that the car's occupants were "leaning out of the open windows of the vehicle." But, as we have discussed, this is impermissible at the summary judgment stage. Defendants also point to *post*-stop conduct— continuing to drive slowly without immediately pulling over after the first indication to stop, over which there is a fact dispute—but that is irrelevant to whether there was reasonable suspicion to initiate the stop in the first place, as "reasonable suspicion must be [present] . . . at the time of the decision to stop a person." *United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992).

---

[4] Hankins additionally cites *Gonzalez v. Huerta*, 826 F.3d 854 (5th Cir. 2016). We do not rely on it as clearly established law because we did not "explicitly rul[e] on" whether there was a violation. *Id.* at 857 n.4. That was because the plaintiff argued solely that the officer's "demand for identification constitute[d] a seizure under the Fourth Amendment and must be based on reasonable suspicion," *id.* at 857, and we concluded there was no clearly established law on that narrow, demand-for-identification point given "the Supreme Court has routinely reconsidered the scope of individual constitutional rights in [the] school setting" in which that encounter occurred and the officer detained the man "at least in part" because he believed the man "was required to identify himself pursuant to" a state education law, *id.* at 858.

No. 23-30711

We do not otherwise see salient features of the cases we have identified as setting out clearly established law that would favor defendants but, to the extent there are any, they would be outweighed by two features of this case. First, the undisputed fact that Hankins approached Wheeler to ask for help finding a lost chihuahua. In the *Hill* and *Alexander* cases cited by Hankins, there were—unlike an affirmative approach for assistance here—elements of evasion such as quickly exiting a car upon observing police (*Hill*) and looking around, seeing police, and driving away (*Alexander*). That we concluded there was no reasonable suspicion in those cases despite what could be considered furtive evasiveness makes the impermissibility of a stop based on the factors here even more stark. Second, Hankins' disputed testimony that Officer Wheeler said the group was stopped because they were "three young men, in a nice car, in this neighborhood." In the cases cited by Hankins, we concluded there was no reasonable suspicion even without a contemporaneous explanation from the officer performing the stop that amounted to no more than an impermissible hunch. And the throughline—the quintessential clearly established law—of our highly fact-intensive jurisprudence is that such stops, based on "inchoate and unparticularized suspicion," are unlawful. *Wardlow*, 528 U.S. at 123–24.

C

We vacate the district court's summary judgment to defendants on the excessive force claim following the seizure and remand for the district court to consider the implication of our holding on the seizure claim.

Excessive force analysis requires determining whether an alleged injury resulting from force was "excessive to the need" and that "the force used was objectively unreasonable." *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (citations omitted). Those two inquiries "collapse into a single objective-reasonableness inquiry," *Peña v. City of Rio Grande City*, 879 F.3d

613, 619 (5th Cir. 2018), in which courts "examine the totality of the circumstances to determine whether an officer's actions were objectively unreasonable," *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (internal quotation marks and citation omitted). Those circumstances include the "severity of the crime," "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is . . . attempting to evade arrest by flight." *Darden v. City of Fort Worth*, 880 F.3d 722, 728–29 (5th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Our conclusion as to reasonable suspicion for the seizure directly implicates the crime-severity and officer-safety factors, as defendants' counsel acknowledged at oral argument. And, as discussed above, there is a fact dispute as to how far the car that Hankins was a passenger in continued, if at all, after an indication to pull over, which goes to the arrest-evasion factor. Therefore, we think it is inappropriate to address the excessive force claim in the first instance and remand for the district court to conduct its own analysis in light of our holding on the seizure claim.

### D

Finally, because the district court granted summary judgment on the remaining federal claims on the ground that each lacked a requisite underlying constitutional violation, we vacate the summary judgment on those claims so that the district court may address them on remand.

\* \* \*

For the foregoing reasons, we REVERSE the summary judgment on the seizure claim, VACATE the summary judgment on the other federal claims, and REMAND for further proceedings.